# In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-2964

PHILOMENA IWEKA NWAOKOLO,

*Petitioner*,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals
No. A27-226-360

ON MOTION FOR STAY OF REMOVAL

DECIDED DECEMBER 27, 2002*

Before POSNER, RIPPLE and MANION, *Circuit Judges.*

PER CURIAM. Philomena Nwaokolo asks that we stay her removal pending review of the denial of her petition to reopen the removal proceedings. We conclude that venue is proper in this court and that a stay is appropriate pending our plenary review of this matter. In our view, Ms. Nwaokolo has met her burden of establishing that she has a better than negligible chance of prevailing on the merits and that she and her daughter, an United States

---

* This opinion originally was released in typescript form.

citizen, will suffer irreparable injury if she is removed from the United States at this time. More precisely, she has demonstrated that the INS has failed to consider that her four-year old United States citizen daughter will be subjected to the brutal practice known as female genital mutilation (commonly referred to as "FGM") if she must accompany her mother to Nigeria.

# I

Ms. Nwaokolo, a native and citizen of Nigeria, legally entered the United States in the early 1980s on an F-2 visa for spouses or children of academic students. When Ms. Nwaokolo accepted employment as a nursing aid in violation of the terms of the visa, the INS commenced deportation proceedings against her. The immigration judge ("IJ") ordered Ms. Nwaokolo deported, but granted her voluntary departure through May 1986. Ms. Nwaokolo did not appeal the IJ's order, but she failed to depart.

In October 1996, Ms. Nwaokolo, by then the mother of two sons and a daughter, obtained counsel and began her efforts to obtain permission to remain in this country. She twice moved to reopen her case, but an IJ denied both motions, one in February 1997 and one in August 1997. The Board of Immigration Appeals ("BIA") affirmed, and Ms. Nwaokolo did not petition for review. In July 1999, Ms. Nwaokolo (again through counsel) filed a third motion to reopen her case under 8 C.F.R. §§ 3.2 and 208.18(b)(3)(ii)(A), this time seeking protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as implemented by the INS, *see* 8 C.F.R. § 208.16(c). Ms. Nwaokolo claimed that she and her thirteen-year old daughter Rachel, a United States citizen who has spent her entire life in this country, would

be subjected to FGM if Ms. Nwaokolo were deported to Nigeria. In May 2001, the BIA denied the motion but granted Ms. Nwaokolo a stay of deportation through March 6, 2002. The BIA opined that Ms. Nwaokolo "offered no evidence or claim that she would be tortured in Nigeria." A.R. 118. The BIA decision includes no discussion of FGM and does not mention Rachel. Ms. Nwaokolo did not seek review of the BIA's decision.

In February 2002, Ms. Nwaokolo filed a fourth motion to reopen her case on the ground that her circumstances had changed, *see* 8 C.F.R. § 3.2(c)(3)(ii), since she filed her third motion to reopen. It is this motion that gives rise to Ms. Nwaokolo's petition for review and stay motion. In the motion, Ms. Nwaokolo reasserted her claim under the Convention Against Torture, but this time with respect to her second daughter Victoria (who was not yet born when Ms. Nwaokolo first asserted her torture claim). Ms. Nwaokolo cited as changed circumstances (1) Victoria's birth in October 1999, (2) an unpublished November 23, 2001, decision wherein the BIA granted a motion to reopen under circumstances substantially similar to Ms. Nwaokolo's, and (3) new legal protections and remedies under the Convention Against Torture. Along with her motion, Ms. Nwaokolo presented a State Department memorandum describing FGM and the serious physical and psychological injury that the procedure inflicts on those subjected to it. Ms. Nwaokolo also tendered Country Reports on Human Rights Practices for 2000, S. Rep. No. 107-32 (2001), authored by the State Department, which confirms that FGM remains "widely practiced" in Nigeria. The BIA denied the motion to reopen on June 28, 2002, concluding that (1) the applicable regulations limit an alien to one motion to reopen absent changed circumstances, *see* 8 C.F.R. § 3.2(c)(2), and (2) Ms. Nwaokolo failed to establish that she should be excepted from the

one-motion limit based on changed circumstances because she was simply reasserting the same claim that the BIA had rejected when it denied her third motion to reopen. The BIA decision is again silent about FGM and includes no discussion of Ms. Nwaokolo's daughter Victoria.

Thereafter, Ms. Nwaokolo filed her petition for review in this court and requested that we stay her removal pending resolution of the petition. We ordered a temporary stay to allow the parties to more thoroughly brief the issues raised in the stay motion. When the parties filed their briefs, a potential problem came to our attention: The IJ who originally decided Ms. Nwaokolo's case was sitting in St. Paul, Minnesota, which is within the jurisdiction of the United States Court of Appeals for the Eighth Circuit. We therefore ordered the parties to brief the question whether this case should be transferred to the Eighth Circuit. The parties have filed their briefs on that issue, and we conclude that venue is proper in this circuit and that a stay pending resolution of Ms. Nwaokolo's petition for review is appropriate.

## II

### A. Venue

Section 1252(b)(2) of Title 8 of the United States Code, entitled "Venue and forms," provides that a "petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." Ms. Nwaokolo maintains that § 1252(b)(2) is merely a venue provision that, read properly, does not require us to transfer this case. Specifically, Ms. Nwaokolo argues that (1) her motion to reopen was filed and decided in Chicago, Illinois, so that the "proceedings" at issue were "completed" in the Seventh Circuit, and (2) even if the pro-

ceedings were completed in the Eighth Circuit, the INS has waived its objection to venue here.

The INS takes a different approach. In its view, Ms. Nwaokolo's "underlying case before the immigration judge began and ended prior to April 1, 1997. In light of this, the case is governed by the transition rules for judicial review as set forth in Section 309(c)(4)(D) of [IIRIRA]." Response at 2 (internal citations omitted). The transitional rules, in turn, apply the venue rule of § 1252(b). The INS further maintains that § 1252(b) is not only a venue re-quirement, but also a jurisdictional requirement. Con-sequently, the INS argues, jurisdiction over Ms. Nwaokolo's petition lies only with the Eighth Circuit—the circuit in which the underlying deportation proceedings were con-cluded.

It is true that Ms. Nwaokolo's case "began and ended prior to April 1, 1997." However, it is also true that Ms. Nwaokolo's proceedings were commenced, and a final order of deportation was first entered, prior to October 31, 1996.[1] Consequently, Ms. Nwaokolo's petition is not gov-erned by the transition rules, but by the former judicial review provision, 8 U.S.C. § 1105a. *See Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir. 1997).

The former judicial review provision stated that "the venue for any petition for review under this section shall be in the judicial circuit in which the administrative pro-ceedings before a special inquiry officer were conducted

---

[1] An IJ first found Ms. Nwaokolo deportable on December 11, 1985. *See* A.R. 220-22. Ms. Nwaokolo did not appeal this deci-sion to the BIA; consequently, the order became a final order of deportation after the expiration of ninety days (the time for appeal), *see* 8 U.S.C. § 1101(a)(47)(B).

in whole or in part . . . ." 8 U.S.C. § 1105a (1994). In this case, part of the proceedings were conducted in this circuit. That is because Ms. Nwaokolo's motion to reopen is part and parcel of her deportation proceedings. *Cf. Chow v. INS*, 113 F.3d 659, 664 (7th Cir. 1997) ("Congress has not clearly expressed an intent to depart from the long line of Supreme Court and appellate court decisions interpreting 'order of deportation' to include orders denying motions to reconsider and reopen."), *abrogated on other grounds by LeGuerre v. Reno*, 164 F.3d 1035 (7th Cir. 1998). The record reveals that in October 1996 the Executive Office for Immigration Review advised Ms. Nwaokolo that her case was "under the administrative control of the Immigration Court in Chicago, Illinois," and instructed Ms. Nwaokolo to "submit appropriate documents to that office." It therefore is apparent that the INS had transferred Ms. Nwaokolo's deportation proceedings to its Chicago office. *See* 8 C.F.R. § 3.2(i) ("If the order [from the BIA disposing of a motion to reopen] directs a reopening and further proceedings are necessary, the record shall be returned to the Immigration Court or the officer of the Service having administrative control over the place where the reopened proceedings are to be conducted."). Thus, the proceedings were conducted "in part" in Chicago where Ms. Nwaokolo was directed to make her filings, and venue for Ms. Nwaokolo's petition for review lies with this court.

Even if the INS is incorrect, and the operative "final order" is the BIA's denial of Ms. Nwaokolo's fourth motion to reopen issued on June 28, 2002, the same result obtains. In that case, the transition rules of IIRIRA would apply because they set forth the venue requirements for deportation and exclusion cases in proceedings on April 1, 1997 and in which a final order was issued on or after October 31, 1996. The transition rule states that "the petition

for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed." With respect to the BIA's denial of Ms. Nwaokolo's fourth motion to reopen, the operative final order under this scenario, the proceedings before the immigration judge were completed in Chicago. Consequently, even assuming a later-in-time final order, venue still lies with this court.

In any event, the INS has waived any objection to venue in this circuit by failing to object to this court's consideration of the case until we requested briefing on the transfer question months after Ms. Nwaokolo filed her petition and stay motion. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 905 (7th Cir. 1999) (stating that party waives venue if it fails to timely object on that ground).[2]

---

[2] As noted above, the INS urges us to conclude that § 1252(b)(2) is a jurisdictional provision and argues that, because the IJ initially decided this case in the Eighth Circuit, only that court has jurisdiction to consider Ms. Nwaokolo's petition for review. Although some courts have used the term "jurisdictional" in reference to § 1252(b)(2), *see, e.g., Hyun Min Park v. Heston,* 245 F.3d 665, 666 (8th Cir. 2001); *Rodriguez v. Reno,* 178 F.3d 1139, 1144 (11th Cir. 1999), we think it is clearly a venue provision. As an initial matter, the above-cited cases offer no rationale that supports construing § 1252(b)(2) to deprive any circuit court of appeals of subject matter jurisdiction over any petition for review. *Cf. Drakes v. Zimski,* 240 F.3d 246, 247 (3d Cir. 2001) (characterizing § 1252(b)(2) as a "jurisdictional bar" to filing petitions for review in federal district court).

Moreover, we have held that comparable provisions in other statutes are venue and not jurisdictional provisions. *See State of New York v. Envtl. Prot. Agency,* 133 F.3d 987 (7th Cir. 1998)

(continued...)

**B. The Merits**

A movant seeking a stay of deportation must show (1) "some" likelihood that her petition for review will succeed on the merits; (2) that irreparable harm will occur if the stay is denied; (3) that the potential harm to the movant outweighs the harm the INS will suffer if a stay is granted; and (4) that a stay serves the public interest.

---

[2] (...continued)
(holding that § 7607(b)(1) of the Clean Air Act, which requires "nationally applicable" petitions for review to be filed in the D.C. Circuit and "locally or regionally applicable" petitions to be filed in the regional circuits, is a venue provision). In *State of New York*, we explained the difference between venue and jurisdictional provisions as follows:

> Provisions specifying where a suit shall be filed, as distinct from specifying what kind of court or other tribunal it shall be filed in, are generally considered to be specifying venue rather than jurisdiction. It would be usurpative for a federal court to assert jurisdiction over a case that the Constitution or statute had consigned to a state court, or even for a federal district court to assert jurisdiction over a case that should have been brought in a federal court of appeals . . . . But it is not usurpative for one federal court of appeals to assert jurisdiction . . . over a case that it would have been authorized to adjudicate if only the effects of the order sought to be reviewed had been felt in one part of the country rather than another.

133 F.3d at 990 (citations omitted); *see also Sprague v. King*, 23 F.3d 185, 188 (7th Cir. 1994) ("[T]hat [the APA] directs claims . . . to the federal circuit rather than to the district courts and regional courts of appeals, is more in the nature of a venue rule . . . than of a limitation on jurisdiction."). We believe that *State of New York* and *Sprague* control and, accordingly, that § 1252(b)(2) is a venue and not a jurisdictional provision.

*Sofinet v. INS*, 188 F.3d 703, 706-07 (7th Cir. 1999). To satisfy the likelihood-of-success prong, Ms. Nwaokolo need only show that her chances of success are "better than negligible." *Id.* We have described the *Sofinet* analysis as a "sliding scale." *Id.* Thus, the more likely it is that Ms. Nwaokolo will succeed on the merits, the less the balance of irreparable harm needs to weigh in her favor; similarly, the less likely success is, the more the balance of harm must weigh in her favor. *Id.*

To prevail on her petition for review, Ms. Nwaokolo must demonstrate that the BIA abused its discretion in denying her motion to reopen. *See Arreola-Arellano v. INS*, 223 F.3d 653, 655 (7th Cir. 2000). Our review is "limited to whether the discretion was actually exercised and whether it was exercised in an arbitrary or capricious manner." *Akinyemi v. INS*, 969 F.2d 285, 288 (7th Cir. 1992). We shall reverse the BIA's decision if it was made "without a rational explanation." *Mansour v. INS*, 230 F.3d 902, 907 (7th Cir. 2000); *Akinyemi*, 969 F.2d at 288.

### 1.  Likelihood of Success

We believe that Ms. Nwaokolo has a better than negligible chance of meeting her burden on appeal. "[T]he exercise of discretion in a particular case necessarily requires [the BIA's] consideration of all facts and circumstances involved." *Akinyemi*, 969 F.2d at 289. We have recognized that when an alien minor's parents are deported, the minor "will have to follow his parents into exile . . . he is constructively deported and should therefore, one might suppose, be entitled to ask—or more realistically his parents' lawyer should be entitled to ask on his behalf—for [discretionary relief]." *Salameda v. INS*, 70 F.3d 447, 451 (7th Cir. 1995). The INS offers no reason why Vic-

toria, a United States citizen with a fundamental right to be in this country, *see Schneider v. Rusk*, 377 U.S. 163, 167 (1964), should be entitled to any less consideration from the BIA or this court, especially when she faces not simply the hardship of living in another country, but, despite her United States citizenship and her age, the prospect of torture in that country. It is arguable, therefore, that the BIA abused its discretion in denying Ms. Nwaokolo's motion to reopen if it failed to consider the threat that four-year old Victoria will be subjected to FGM as a direct consequence of the decision to remove her mother. *Cf. Casem v. INS*, 8 F.3d 700, 702-03 (9th Cir. 1993) (citing authority from the Third, Fifth and Ninth Circuits holding that the exercise of discretion requires the BIA to consider "all relevant factors" and that the BIA abused its discretion in failing to consider the relevant factor of the hardship to United States citizen children that would result from deportation of alien parents).

The record before us offers no reason to believe that the BIA ever considered the threat to Victoria from the widespread practice of FGM in her mother's home country of Nigeria. The BIA concluded that Ms. Nwaokolo failed to show changed circumstances based on its conclusion that it already had considered and rejected Ms. Nwaokolo's claim that she and her elder daughter Rachel would become victims of FGM if she is removed to Nigeria. We find this reasoning problematic in two respects. First, the BIA *did not* consider at all the effect that removing her mother would have on Rachel. The BIA's written denial of Ms. Nwaokolo's third motion to reopen concludes only that *Ms. Nwaokolo* "offered no evidence or claim that she would be tortured in Nigeria," A.R. 118; the decision is devoid of any discussion of the threat that Rachel would be subjected to FGM. Second, even if we were to speculate from its silence that the BIA had evaluated

the threat to Rachel in refusing to reopen proceedings as to Ms. Nwaokolo, that would not in our view constitute consideration of the threat to Victoria.

Our view is informed by an understanding of how FGM is practiced in Nigeria, which information we take from the State Department's reports on the subject. Ms. Nwaokolo presented some of this information to the BIA. Regardless, we can take judicial notice of the State Department's reports on current country conditions that the BIA failed to consider and that are crucial to our decision. *See Meghani v. INS*, 236 F.3d 843, 848 n.1 (7th Cir. 2001); *Dobrota v. INS*, 195 F.3d 970, 973 (7th Cir. 1999). According to the State Department, at all times during Ms. Nwaokolo's efforts to have the BIA consider the threat that her daughters would be subjected to FGM, the ritual was widely practiced and legal in Nigeria; indeed, 60 to 90 percent of the female population of Nigeria are subjected to it "anytime from a few days after birth to a few days after death." *See* Nigeria: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC), June 1, 2001, Dep't St. Bull., *available at* http:/www.state.gov/g/wi/rls/rep/crfgm/10106.htm. FGM is a horrifically brutal procedure, often performed without anesthesia. *See id.* According to the State Department memorandum that Ms. Nwaokolo attached to her motion to reopen,

> Female Genital Mutilation (FGM) is the removal or infibulation (or both) of whole or part of the external female genitals (clitoris, labia minora, and labia majora). The procedure can include sewing the vagina almost completely closed after the genitals are removed (infibulation) . . . .

> The World Health Organization and other United Nations organizations, as well as the United States government, recognize that FGM has very serious

effects on the health of women and girls. Immediate complications of FGM include severe pain, shock, hemorrhage, urine retention, ulceration of the genital region, and injury to the adjacent tissue. Hemorrhage and infection can cause death.

Long term consequences of FGM include cysts and abscesses, keloid scar formation, painful intercourse, and sexual dysfunction. The most extreme forms of FGM can cause infertility, and may also cause an increase in the risk of stillbirths and maternal deaths.

Psychological consequences of FGM in childhood can include behavior disturbances and loss of trust and confidence in caregivers. As adults, these women may suffer feelings of incompleteness, anxiety, depression, chronic irritability, and frigidity, and may experience marital conflicts.

*See* A.R. at 110-11. Further, FGM seems deeply embedded in Nigerian culture. "Nigerians continue this practice out of adherence to a cultural dictate that uncircumcised women are promiscuous, unclean, unmarriageable, physically undesireable and/or potential health risks to themselves and their children, especially during childbirth." *See, infra*, Nigeria: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC). The BIA itself has expressly recognized the prevalence and brutality of FGM:

This practice [FGM] clearly inflicts harm or suffering upon the girl or woman who undergoes it. FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to

> the urethra and anus . . . . [I]t remains practically true that [African] women have little legal recourse and may face threats to their freedom, threats or acts of physical violence, or social ostracization for refusing to undergo this harmful traditional practice or attempting to protect their female children.

*In re Kasinga,* 21 I. & N. Dec. 357, 361-62 (BIA 1996) (holding that fear of FGM is a basis for seeking asylum).

Based on our understanding of FGM as practiced in Nigeria and on the age difference between Rachel and Victoria, we believe that, contrary to the INS' assertion that the BIA considered Victoria's interests when it denied Ms. Nwaokolo's third motion to reopen, the threat FGM poses to Victoria is qualitatively different from that to Rachel. Unlike Rachel, who was born July 18, 1985, and as a seventeen-year old could conceivably remain in this country, Victoria was born October 1, 1999, and as a four-year old will presumably have no choice but to depart with Ms. Nwaokolo to Nigeria. Rachel, who was thirteen years old when Ms. Nwaokolo argued to the BIA that the threat to Rachel from FGM was reason to reopen her case, was already more capable, both physically and mentally, of resisting FGM than Victoria would be now at age four. Victoria also would have to live with the threat of FGM for many years before she could choose to return to the United States, a much longer period of time than Rachel would have to face the threat, if the INS effectively compels both girls to involuntarily relocate to Nigeria despite their United States citizenship.

In short, we think it obvious that, even if the BIA had considered and rejected the threat to Rachel from FGM (and there is no indication that this consideration occurred), that fact would not dispose of the threat to Victoria, which involves a different set of circumstances. As a result, Ms.

Nwaokolo has a colorable argument that the BIA abused its discretion when it (1) failed to consider the State Department's reports on current conditions in Nigeria, and (2) concluded without explanation, and in the face of its own recognition in *Kasinga* of the serious threat FGM poses to its victims, that Rachel's and Victoria's interests are one in the same. *See Mansour*, 230 F.3d at 907 (holding that BIA abused discretion in denying Iraqi alien's motion to reopen under CAT without addressing a State Department report suggesting that the Iraqi government has engaged in abuses against Assyrian Christians like petitioner and stating that silence regarding the report indicated that BIA did not afford a complete review to Iraqi alien's claim); *see also Abassi v. INS*, 305 F.3d 1028, 1031 (9th Cir. 2002) (holding that BIA abused discretion in failing to consider State Department's easily obtainable reports on current country conditions even though applicant failed to attach report to asylum application).

### 2. The Remaining *Sofinet* Factors

When we consider the foregoing along with the other *Sofinet* factors, the propriety of a stay becomes even clearer. The severity of the harm that Ms. Nwaokolo, Rachel, and Victoria face if Ms. Nwaokolo is removed to Nigeria is obvious. The harm to the INS if we grant a stay is negligible. It is true that a stay will result in some delay in the INS' efforts to remove Ms. Nwaokolo. However, we find it significant that, according to the record, the INS has known for years exactly where Ms. Nwaokolo resides and has not actively sought to expedite her removal.

Finally, a stay promotes the public's compelling interest in ensuring that minor United States citizens are not forced into exile to be tortured. This compelling interest is magnified here because neither Rachel nor Victoria

has ever been represented by counsel or has ever had their interests considered by the BIA or any court. Nor is there any evidence in the record that the INS has ever notified responsible state authorities of the departure of these minor United States citizens to a country where they would be in immediate danger of significant harm. The government could never do to these girls in this country what the INS seems all too willing to allow to happen to them in Nigeria. At a minimum, the issues we have discussed here deserve a full airing by way of a petition for review.

Accordingly, we GRANT Ms. Nwaokolo's stay motion and order that her removal be STAYED pending resolution of the petition for review. Additionally, we DIRECT the parties to brief, in addition to any other issues they choose to address in their merits briefs, the following questions:

1.   Was the BIA required to consider the hardship of Ms. Nwaokolo's United States citizen daughters in denying her motion to reopen and, if so, did the BIA adequately consider such hardship?

2.   When the INS has reason to believe that removal of an alien parent will place the United States citizen child at risk of physical injury, does the INS have an obligation to notify the appropriate state authorities charged with protecting child welfare?

IT IS FURTHER ORDERED that briefing in this appeal shall proceed as follows:

1.   Ms. Nwaokolo shall file her main brief by January 27, 2003.

2.   The INS shall file its response brief by February 26, 2003.

3.  Ms. Nwaokolo shall file her reply brief, if any, by March 12, 2003.

Ms. Nwaokolo's "Motion For Default Judgement [sic] Based On Late Filing By Respondent," filed on November 18, 2002, is DENIED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*