# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BOB BENITO BENYAMIN; ANABELLA
RODRIGUEZ; ANNISA SOFIA
BENYAMIN; ANAKARINA BENYAMIN;
BOBBY AMIN BENYAMIN,

              *Petitioners,*

v.

ERIC H. HOLDER JR., Attorney
General,

              *Respondent.*

No. 05-71488

Agency Nos.
A095-592-450
A095-592-451
A095-592-452
A095-592-453
A095-592-454

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 9, 2008—San Francisco, California

Filed August 24, 2009

Before: Betty B. Fletcher, M. Margaret McKeown and
N. Randy Smith, Circuit Judges.

Opinion by Judge McKeown

11579

## COUNSEL

Eugene C. Wong and Robert G. Ryan, Law Offices of Eugene C. Wong, P.C., San Francisco, California, for the petitioners.

Peter D. Keisler, Assistant Attorney General, David V. Bernal, Assistant Director, Office of Immigration Litigation, John E. Arbab, U.S. Department of Justice, Environment & Natural Resources Division, S. Nicole Nardone, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Robert E. LeFevre, Office of the District Counsel, Department of Homeland Security, San Francisco, California, for the respondent.

## OPINION

McKEOWN, Circuit Judge:

Our circuit has wisely recognized the abhorrence of the practice of female genital mutilation. Defined as an act that "involves the cutting and removal of all or some of a girl or a woman's external genitalia[,] . . . the procedure is 'extremely painful' and 'permanently disfigures the female genitalia . . . expos[ing] the girl or woman to the risk of serious, potentially life-threatening complications.' " *Mohammed v. Gonzales*, 400 F.3d 785, 789 (9th Cir. 2005) (alterations in original) (quoting *In re Kasinga*, 21 I. & N. Dec. 357, 361 (BIA 1996)). Like forced sterilization, the damage is done at the outset, but the medical and psychological consequences of female genital mutilation linger for a lifetime. Our recognition of the severity of female genital mutilation, even in its ostensibly least intrusive form, guides our decision in this troubling case.

Bob Benito Benyamin ("Benyamin"), a native and citizen of Indonesia, petitions for review of the Board of Immigration Appeals' ("BIA") denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Benyamin's wife, Anabella Rodriguez ("Rodriguez"), is a native and citizen of Venezuela. Rodriguez and the couple's three children, Annisa Sofia Benyamin ("Annisa"), Anakarina Benyamin ("Anakarina"), and Bobby Amin Benyamin ("Bobby"), are listed as derivative beneficiaries of Benyamin's application.

Benyamin asserted that his daughter, Annisa, suffered persecution in Indonesia by enduring female genital mutilation as a five-day-old infant, without his consent or that of his wife.[1]

---

[1]Benyamin and Rodriguez describe the procedure that Annisa endured as "circumcision." The practice is known in our case law as "female genital mutilation." *See e.g.*, *Mohammed*, 400 F.3d at 789. We use the terms interchangeably.

Benyamin further claimed that he fears that his younger daughter, Anakarina, may face the threat of female genital mutilation if the family is forced to return to Indonesia. Finally, Benyamin argued that he faced past persecution and the threat of future persecution on the basis of his membership in a particular social group, defining the group as Muslim men married to Roman Catholic women in Indonesia.

Reasoning that female circumcision practices in Indonesia "appear to be of a less extreme variety" than those described in a case involving Ethiopia, the BIA affirmed the Immigration Judge's ("IJ") decision that Benyamin had not established that he suffered persecution or that he had a well-founded fear of future persecution. The BIA also rejected Benyamin's argument of persecution based on his membership in a particular social group.

The BIA's determination concerning the persecution Annisa suffered when she was forced to undergo female genital mutilation and the dismissal of that procedure as a lesser form of circumcision was erroneous. Female genital mutilation "constitutes persecution sufficient to support an asylum claim." *Abebe v. Gonzales*, 432 F.3d 1037, 1039 (9th Cir. 2005) (en banc). The BIA's conclusion to the contrary is at odds with Ninth Circuit law and represents a misunderstanding of the BIA's own precedent. The BIA also erred in failing to consider whether the threat that Anakarina would be forced to undergo female genital mutilation in the future could be a ground for relief in this matter. Substantial evidence supports the rejection of Benyamin's other proffered basis for relief. We grant the petition for review and remand for further proceedings consistent with this opinion.

## BACKGROUND

Benyamin and Rodriguez were residing in the United States under non-immigrant visas when they married in 1987. When their visas expired, the couple moved to Jakarta, Indonesia.

Their daughter, Annisa, was born in Indonesia in 1992. Soon after Annisa's birth, the family moved to Venezuela, where Anakarina was born. In December 1994, the family returned to Indonesia, where Bobby was born in 1996. The family remained in Indonesia until September 1999, when they lawfully entered the United States. Benyamin returned to Indonesia for a short period and entered the United States for the last time in June 2000 under a business visa. His visa expired in June 2002, and Benyamin filed an application for asylum and withholding of removal in August 2002. Benyamin listed Rodriguez, Annisa, Anakarina, and Bobby as derivative applicants.

In his application, Benyamin alleged that he and his family suffered persecution while they lived in Indonesia. Benyamin is Muslim, and his wife, Rodriguez, is Catholic. While Benyamin described the mistreatment of Rodriguez at the hands of his family, alienation and humiliation from friends, societal restrictions on his wife's activities, and discrimination on the basis of religion perpetrated by the Indonesian government against Rodriguez, the crucial allegation in his application was that his daughter, Annisa, endured forced female genital mutilation ordered by Benyamin's stepmother when Annisa was a newborn. Annisa suffered through this procedure without the consent of her parents.

During the hearing before the IJ, Rodriguez confirmed her husband's allegations about the female genital mutilation that Annisa suffered. Rodriguez described that when Annisa was five-days old and still in the hospital, Benyamin's stepmother ordered Annisa's circumcision without the couple's consent. Benyamin's testimony corroborated his application and his wife's testimony, including the fact that he did not consent to the procedure. Rodriguez further explained that Annisa has continually experienced pain as a result of the procedure, most notably when she washes her genitals. These complications were at their worst when Annisa was four years old, but were still ongoing as of the time of the hearing before the IJ.

Rodriguez reported that the couple's other daughter, Anakarina, is not circumcised, as she was born in Venezuela, not Indonesia. Both Rodriguez and Benyamin testified, however, that they fear that if the family is forced to return to Indonesia, Anakarina may become a victim of female genital mutilation.

In reviewing Benyamin's application, the IJ concluded that she could only consider whether Benyamin himself had suffered past persecution or had a well-founded fear of future persecution, as "none of the other respondents have specifically applied for asylum by submitting their own application." The IJ determined that Benyamin suffered no specific harm in Indonesia as a result of his marriage to a Catholic woman.

As to circumcision, the IJ found that the procedure performed on Annisa was a "harm," but nevertheless determined that neither Benyamin nor Rodriguez "has alleged that any particular harm has come to them or would come to them for opposing Annisa's circumcision . . . ." The IJ further noted that a State Department report submitted with the asylum application discussed female genital mutilation as practiced in Indonesia and detailed that "the physical harm of the operation appear[s] to be minimal." With respect to the possibility that Anakarina would be forced to undergo female genital mutilation if the family were returned to Indonesia, the IJ found there was no evidence to support the couple's fear. As a result, the IJ determined that Benyamin failed to establish statutory eligibility for asylum and denied Benyamin's application, along with his request for relief under the CAT. Notably, however, the IJ did not make an adverse credibility finding in her decision.

The BIA dismissed Benyamin's appeal. First, the BIA determined that the IJ correctly found that Benyamin did not suffer past persecution in Indonesia and agreed with the IJ's finding that the discrimination and ill treatment Rodriguez endured in Indonesia did not rise to the level of persecution.

Second, by comparing the procedure that Annisa underwent to the female genital mutilation described in *Kasinga*, 21 I & N Dec. 357, the BIA determined that Annisa's circumcision did not rise to the level of persecution, as it was less severe than the procedure described in *Kasinga* and "FGM as practiced in Indonesia involves minimal short-term pain, suffering, and complications." Third, the BIA affirmed the IJ's determination that Benyamin failed to establish that there was a risk of future persecution because the record did not indicate that individuals in mixed-religion marriages are persecuted in Indonesia or that parents who oppose female genital mutilation are persecuted. Finally, the BIA agreed with the IJ's denial of Benyamin's request for withholding of removal and relief under the CAT.

## ANALYSIS

The BIA did not state whether it conducted a de novo or abuse of discretion review in this matter. Where the standard of review the BIA employed is unclear, we may look to both the BIA's decision and the IJ's oral decision "as a guide to what lay behind the BIA's conclusion." *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1197 (9th Cir. 2000). Because the IJ made no adverse credibility determination, we take the testimony of Benyamin and Rodriguez as true. *See Sinha v. Holder*, 564 F.3d 1015, 1020 (9th Cir. 2009).

We review factual findings for substantial evidence. *Mohammed*, 400 F.3d at 791. Questions of law we review de novo. *Id.* at 791-92. Significant to this case, we "will not defer to BIA decisions that conflict with circuit precedent." *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003).

## I. CONSTRUCTIVE DEPORTATION

[1] Benyamin's application for asylum raises a unique concern—the effect that the BIA's decision to deny relief to Benyamin will have on his alien minor children. "Because a

minor alien has no legal right to remain in the United States, 'deportation of [her] parents would result in [her] being constructively deported.' " *Abebe*, 432 F.3d at 1048-49 (Tallman, J., dissenting in part and concurring in part) (alteration in original) (quoting *Oforji v. Ashcroft*, 354 F.3d 609, 616 (7th Cir. 2003)). "Thus, when addressing the parent['s] application for asylum, it is proper to consider not only the potential persecution the child may face, but also any hardship to the alien child due to the deportation of her parent[ ]." *Id.* at 1049.

We recognized this parent-child conundrum, often referred to as "constructive deportation," in *Abebe*. *See id.* at 1048-49. In that case, we considered the petition for review filed by Sisay Mengistu and his wife, Almaz Abebe, after the BIA denied their application for asylum and withholding of removal. *See id.* at 1038. "Petitioners argued that if the family were returned to Ethiopia, their nine-year-old daughter would be subjected to female genital mutilation (FGM) . . . ." *Id.* at 1038-39. Sitting en banc, we underscored that it "is well-settled that FGM constitutes persecution sufficient to warrant a grant of asylum." *Id.* at 1042. We also concluded that "the evidence indicated that the probability that [the daughter] would have to undergo this ritual [female genital mutilation] [if the family were forced to return to Ethiopia] greatly exceeded the threshold required to establish eligibility for asylum." *Id.* at 1043. As a result, following the Supreme Court's directive to allow the BIA the opportunity to address matters in the first instance, *see id.* (citing *INS v. Ventura*, 537 U.S. 12, 17 (2002)), we remanded the petitioners' case to the BIA to consider "whether Petitioners, parents of a U.S. citizen child likely to face persecution in her parents' native country, may derivatively qualify for asylum." *Id.*

[2] Our case law treats claims of past persecution with as much rigor as those based on the threat of future persecution. Claimants may either demonstrate eligibility for asylum by demonstrating that they have suffered past persecution on the basis of the statutory grounds, thereby creating a rebuttable

presumption of future persecution, *see Mohammed*, 400 F.3d at 798-99, or by showing that they have a well-founded fear of future persecution on account of one of the listed grounds, *see Abebe*, 432 F.3d at 1041-42. These are co-equal avenues for eligibility. Thus, just as we remanded to the BIA in *Abebe* for it to consider whether a parent of a child who is likely to face future persecution in her parent's native country may derivatively qualify for asylum, the BIA should be afforded the opportunity to consider whether a petitioner whose child has faced past persecution in her parent's native country may derivatively qualify for asylum. As the partial dissent in *Abebe* noted, the threat of constructive deportation is more serious where, as here, the children are aliens with no independent right to remain in the country, as opposed to U.S. citizens, who may have alternate means of remaining in the United States, even if their alien parents are deported. *See Abebe*, 432 F.3d at 1048-49 (Tallman, J., dissenting in part and concurring in part). With the concept of constructive deportation in mind, we review Benyamin's petition.

## II.    FEMALE GENITAL MUTILATION

The IJ erred in concluding that she could only consider whether Benyamin himself had suffered past persecution or had a well-founded fear of future persecution. The BIA's determinations regarding Annisa's experience of female genital mutilation are fundamentally flawed and contrary to Ninth Circuit and BIA precedent. As the BIA must be given an opportunity to consider, in the first instance, whether Benyamin may qualify for asylum based on persecution already endured by his alien child, Annisa, or based on the threat of future persecution faced by his alien child, Anakarina, we remand for the BIA to consider Benyamin's claims under a correct understanding of the governing law.

### A.   Past Persecution

Here, the IJ determined—and the BIA agreed—that Benyamin failed to demonstrate past persecution. With

respect to the female genital mutilation perpetrated against Annisa, the IJ determined that Benyamin did not demonstrate how *he* was harmed as a result of the procedure, and further noted that the physical harm that Annisa suffered appeared to be "minimal." The BIA detailed that the IJ found that the female genital mutilation performed on Annisa "was not of the nature described in *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996)." The BIA highlighted a particular section of *Kasinga*, in which the Board stated that " '[t]he FGM practiced by her tribe, . . ., is of an extreme type involving cutting the genitalia with knives, extensive bleeding, and a 40-day recovery period,' and is of an '[e]xtreme nature causing permanent damage, and not just a minor form of genital ritual.' " The BIA "agree[d] with the Immigration Judge that *Kasinga* is distinguishable from this case," noting Rodriguez's testimony that Annisa's recovery time was "short" and referencing a State Department report detailing that "FGM as practiced in Indonesia involves minimal short term-pain, suffering, and complications."

**[3]** It is well-settled in this circuit that female genital mutilation constitutes persecution sufficient to warrant asylum relief. *See Abebe*, 432 F.3d at 1042; *Mohammed*, 400 F.3d at 795-96. Many of our sister circuits have agreed. *See Haoua v. Gonzales*, 472 F.3d 227, 231-32 (4th Cir. 2007) (affirming that female genital mutilation constitutes persecution within the meaning of the Immigration and Nationality Act); *Niang v. Gonzales*, 422 F.3d 1187, 1197-98 (10th Cir. 2005) (same); *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004) (same); *Abankwah v. INS*, 185 F.3d 18, 23 (2d Cir. 1999) (same).

**[4]** As we observed in *Mohammed*, "we have no doubt *that the range of procedures collectively known as female genital mutilation* rises to the level of persecution within the meaning of our asylum law." 400 F.3d at 795 (emphasis added). Thus, the BIA's attempt to parse the distinction between differing forms of female genital mutilation is not only a threat to the rights of women in a civilized society, but also runs counter

to our circuit precedent. We have recognized that "the mutilation of women and girls is 'a horrifically brutal procedure, often performed without anesthesia' that causes both short- and long-term physical and psychological consequences." *Id.* (quoting *Nwaokolo v. INS*, 314 F.3d 303, 308 (7th Cir. 2002)).

**[5]** In *Mohammed* we referenced the World Health Organization's report that "even the least drastic form of female genital mutilation can cause a wide range of complications such as infection, hemorrhaging from the clitoral artery during childbirth, formation of abscesses, development of cysts and tumors, repeated urinary tract infections, and psuedo [sic] infibulation." *Id.* at 800 (citing World Health Organization, *Female Genital Mutilation: An Overview* at 14-15 (1998)). To suggest, as did the IJ, that there is no persecution because of minimal physical harm ignores both the involuntary nature of the procedure and the very real follow-on consequences. It is no surprise that, in describing the Department of State's classifications of the prevalent forms of female genital mutilation, and detailing that the petitioner seemed to have undergone "Type I"—the least severe classified form—we nonetheless determined with "no doubt" that the procedure rises to the level of persecution. *See id.* at 795, 795 n.12. Considering our precedent, the BIA's determination that Annisa's harm did not constitute past persecution because the female genital mutilation she endured was of a comparatively less brutal form is wrong as a matter of law. Our precedent does not tolerate such line-drawing when it comes to this practice, which the Department of State deems as "threaten[ing] the health and violat[ing] the human rights of women." Prevalence of the Practice of Female Genital Mutilation (FGM); Laws Prohibiting FGM and Their Enforcement; Recommendations on How to Best Work to Eliminate FGM, U.S. Dept. of State, *Report on Female Genital Mutilation,* at 4, *available at* http://www.state.gov/documents/organization/9424.pdf.

It also bears noting that the BIA's attempt to distinguish

*Kasinga* belies what *Kasinga* actually stands for.[2] In *Kasinga*, the BIA held that female genital mutilation is a form of persecution that can be the basis for a grant of asylum. 21 I. & N. Dec. at 366. Although the BIA described the type of female genital mutilation at issue in *Kasinga* as "extreme," *see id.* at 361, the decision does not create a floor for the requisite level of physical invasion necessary to render female genital mutilation persecution under the law. Any suggestion otherwise is a betrayal of the central holding of *Kasinga*.

**[6]** In sum, the female genital mutilation that Annisa endured undoubtedly constitutes past persecution. Consequently, we vacate the portion of the BIA's decision that holds that Annisa's mutilation does not constitute persecution. As neither the BIA nor the IJ considered Annisa's persecution in its own right as a potential ground for granting relief to Benyamin, we remand to give the BIA the opportunity to consider the matter in the first instance, as instructed by the Supreme Court in *INS v. Ventura*, 537 U.S. 12, 17 (2002). *See also Abebe*, 432 F.3d at 1043.

### B.    Humanitarian Exception

**[7]** Annisa suffered a form of past persecution that we have recognized as "a particularly severe form of past persecution." *Mohammed*, 400 F.3d at 801. Considering the severity of Annisa's persecution, the BIA has discretion to grant humanitarian asylum. 8 C.F.R. § 1208.13(b)(1)(iii)(A). Because the BIA did not determine whether Annisa's past persecution makes Benyamin and his family eligible for humanitarian asylum, we remand to the BIA to consider in the first instance whether this form of relief should be granted. *See Silaya v. Mukasey*, 524 F.3d 1066, 1072 (9th Cir. 2008).

---

[2]We accord the BIA's single-member order in this case deference under *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944). *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1014-15 (9th Cir. 2006). Nevertheless, the BIA's decision in this case represents a fundamental misreading of *Kasinga*.

## C. Future Persecution

**[8]** The BIA did not address whether Anakarina had a well-founded fear of future persecution based on the threat that she, like her sister, might suffer female genital mutilation. If Anakarina has established a well-founded fear of future persecution, the BIA should consider whether Benyamin may derivatively qualify for asylum based on the threat of harm to Anakarina. *See Abebe*, 432 F.3d at 1043. We remand to give the BIA the opportunity to address the matter in the first instance. *See id.*; *Ventura*, 537 U.S. at 17.

## III. PERSECUTION BASED ON A PARTICULAR SOCIAL GROUP

Benyamin also argued that he suffered past persecution and faced the threat of future persecution in Indonesia based on his mixed-religion marriage. After considering testimony from Benyamin and Rodriguez, the IJ and the BIA determined that Benyamin did not demonstrate eligibility for asylum on that basis. Benyamin "acknowledged that other than having his feelings hurt by having his friends shun him and having difficulties with his family, he has suffered no specific harm in Indonesia due to his marriage to a Catholic." Similarly, the indignities and religious denigration suffered by Rodriquez at the hands of her in-laws and others did not rise to the level of persecution.

**[9]** The BIA aptly noted that the IJ "accurately pointed out that [Benyamin] was able to leave and return to Indonesia numerous times without experiencing harm." The BIA explained that "[s]uch actions undermine [Benyamin's] claim that he is a 'refugee,' where that term is defined as a person who is 'unable or unwilling to return' to the country of origin because of persecution." Nothing in the record compels us to conclude that Benyamin established eligibility for asylum on this ground.

## IV. SAFE HAVEN

Benyamin and the government both concede that the BIA did not address the IJ's finding that Benyamin and his family could find a "safe haven" in Venezuela. On remand, the BIA may consider this issue in the first instance. *See Ventura*, 537 U.S. at 17.

### CONCLUSION

[10] While substantial evidence supports the determination that Benyamin failed to show that he faced past persecution or the threat of future persecution on account of his social group membership, the IJ and the BIA erred in concluding that Benyamin failed to establish that Annisa had endured past persecution by female genital mutilation. The BIA also erred in failing to consider whether Benyamin established a well-founded fear of future persecution based on the possibility that Anakarina would be forced to endure female genital mutilation if forced to return to Indonesia. The BIA should consider in the first instance whether Benyamin may derivatively qualify for asylum.[3] *See Abebe*, 432 F.3d at 1043, 1048-49. Consequently, we grant the petition, vacate the order of removal, and remand for further proceedings consistent with this opinion.

**PETITION FOR REVIEW GRANTED; REMANDED WITH INSTRUCTIONS.**

---

[3]Because Benyamin might derivatively qualify based on the persecution suffered by his children, we do not reach his withholding of removal and CAT claims. *See Li v. Holder*, 559 F.3d 1096, 1113 n.18 (9th Cir. 2009).