# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KHADIJA MOHAMMED,
                        *Petitioner,*

            v.

ALBERTO R. GONZALES,*
Attorney General,
                        *Respondent.*

No. 03-70803

Agency No.
A79-257-632

KHADIJA AHMED MOHAMED,
                        *Petitioner,*

            v.

ALBERTO R. GONZALES,*
Attorney General,
                        *Respondent.*

No. 03-72265

Agency No.
A79-257-632

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 3, 2004—San Francisco, California

Filed March 10, 2005

Before: Stephen Reinhardt, David R. Thompson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Rochelle A. Fortier Nwadibia, Esq., Privitera & Nwadibia, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division; Emily Anne Radford, Assistant Director; Keith I. Bernstein, Joshua E. Braunstein, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

**OPINION**

REINHARDT, Circuit Judge:

Female genital mutilation involves the cutting and removal of all or some of a girl or a woman's external genitalia. Often performed under unsanitary conditions with rudimentary instruments, the procedure is "extremely painful" and "permanently disfigures the female genitalia . . . expos[ing] the girl or woman to the risk of serious, potentially life-threatening complications." *In re Kasinga*, 21 I. & N. Dec. 357, 361 (BIA 1996); *see also Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004); *Abankwah v. INS,* 185 F.3d 18, 23 (2d Cir. 1999). Khadija Ahmed Mohamed,[1] a native and citizen of Somalia, seeks to reopen her asylum, withholding of removal, and Convention Against Torture ("CAT") claims on the basis of her first attorney's failure to present evidence that she suffered this grave harm in the past. We must consider whether the attorney's failure to raise the issue of the genital mutilation to which Mohamed had been subjected as a child constitutes ineffective assistance of counsel sufficient to warrant reopening.

## I. FACTUAL AND PROCEDURAL HISTORY

Mohamed applied for asylum when she was seventeen years old. She claimed that she had a well-founded fear of future persecution on account of her membership in a social group — the Benadiri clan. According to Mohamed, her family fled Somalia during the civil war, when she was a young child. The flight was precipitated by the disappearance of her father and brother, the rape of her sister, and an attempt by the militia of a majority clan to imprison her family along with other members of her clan. She lived in Ethiopia for a number

---

[1]Petitioner's name is spelled inconsistently throughout her brief, either as "Mohammed" or "Mohamed." Because she wrote her name with a single "m" in her signed declarations, we will use that spelling.

of years without legal status, before arriving in the United States.

Following a hearing, the IJ denied Mohamed's petition, finding her not credible. Alternatively, the IJ concluded that, even if she were credible, she did not demonstrate eligibility for asylum, or entitlement to withholding or to protection under CAT. The BIA affirmed the IJ's adverse credibility finding and declined to consider whether Mohamed would have established eligibility for relief had she testified credibly.

A.  *Mohamed's First Motion*

After the BIA denied her appeal, Mohamed hired a new attorney who filed a motion to reconsider and remand. The motion asked the BIA to reconsider on the ground that Mohamed feared that she would be subjected to genital mutilation should she be returned to Somalia.[2] It stated that over ninety-eight percent of women in Somalia are subjected to such mutilation,[3] that Mohamed's first attorney did not raise the issue at the hearing or on appeal, and that Mohamed had not yet been genitally mutilated. The last assertion — that Mohamed had not yet been mutilated — was directly contra-

---

[2]We note that many courts and the BIA refer to the practice at issue here as FGM. We see no need for using initials rather than the full three word phrase. We are short neither of paper nor of ink. The use of initials, if it has any effect, serves only to dull the senses and minimize the barbaric nature of the practice. The further bureaucratization of the language would serve no useful purpose here. We refer to the custom however, because the initials rather than the words appear occasionally in this opinion when quoting portions of other decisions.

[3]To support this statement, the motion cited "Exhibit C." No such attachment appears in the certified administrative record. According to the record, Mohamed's second motion, discussed below, did include an Exhibit C — a report from the World Health Organization on female genital mutilation, stating that ninety-eight percent of the women in Somalia are subjected to the practice.

dicted by the attached physician's report, which stated that the "patient recollects having clitoris cut off with scissors at young age," and is "absent" a "clitoris" and a "prepuce." Also attached to the motion was a letter from Mohamed's prior counsel, in which she admitted that she failed to ask her minor client whether she had been subjected to genital mutilation and did not consider raising it as part of the asylum claim, although she believed that such treatment was "clearly past persecution" (and although the State Department reports contained in the record of the hearing stated that "virtually all" Somalian women were victims of that practice).

In its opposition, the government argued, first, that Mohamed's motion did not qualify as a motion to reconsider, because it did not specify errors of fact or law in the prior decision. Second, it contended that Mohamed did not comply with the requirements for a motion to remand for consideration of new evidence because she sought to introduce evidence that could have been presented at the hearing. Finally, it argued that, to the extent Mohamed sought to reopen on the ground of ineffective assistance of counsel, she failed to comply with the BIA's procedural requirements set forth in *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988).

Mohamed filed a response to the government's opposition stating that she had complied with *Lozada*. Additionally, she attached a declaration and a copy of a complaint form that she had previously sent to the State Bar of California. The documents stated that Mohamed had already been subjected to female genital mutilation, and made clear that she sought to claim asylum, withholding, and protection under CAT on the basis of this past experience. In her declaration Mohamed wrote: "I then hired a new attorney . . . where I learned that my subjection to female genital mutilation constituted past persecution and torture." Similarly, on the State Bar of California complaint form, Mohamed alleged that her first attorney "[f]ailed to raise issue of past persecution on account of female genital mutilation." The government requested that the

BIA allow additional time for Mohamed's first counsel to respond to her allegations, although her response was attached to the motion.

One month later, the BIA issued a decision rife with errors and inconsistencies. The last paragraph of the decision was the only portion that addressed Mohamed's motion. There, the BIA appears to have properly construed the motion as a motion to reopen. It found, however, that the "request for reopening fails notwithstanding her ineffective assistance of counsel claim" because "no evidence was presented with the motion that establishes that [female genital mutilation] would likely be performed . . . in the future." Yet, the BIA then inexplicably concluded its opinion by "find[ing] that the new evidence therefore *does* likely change the result of these proceedings." (emphasis added).

Mohamed petitioned for review of the BIA's denial of her motion.[4]

B.   *Second Motion*

Simultaneously with filing her petition for review, Mohamed filed another motion, this time styling it as a motion to reopen. Again, she alleged that her prior counsel was ineffective in failing to raise the issue of female genital mutilation. She stated that her claim was based on past persecution and that she indeed had been mutilated as a child, and

---

[4]In her petition, Mohamed also requested review of the BIA's earlier decision to dismiss her appeal on the merits. By an earlier order, we limited review to the denial of the motion to reconsider and remand, because the direct appeal was untimely. We have previously held that where, due to counsel's error, a petition for review is untimely, the error deprives the alien of the appellate proceeding entirely and prejudice is presumed. *See Dearinger ex rel. Volkova v. Reno*, 232 F.3d 1042, 1045 (9th Cir. 2000). However, Mohamed does not raise this potential claim of ineffective assistance in her current motion, perhaps because the late filing was the error of her current counsel.

she explained that "the previous motion for reconsideration contained a scribner's error."[5] Attached to the motion were the State Bar of California complaint form against the first counsel, first counsel's letter, Mohamed's declaration, the physician's report, and a report on female genital mutilation from the World Health Organization.

The BIA denied Mohamed's second motion as numerically barred. Nevertheless, it turned to the substance of the motion and attempted to clarify its first opinion. It acknowledged its "typographical errors" and explained that Mohamed "did not demonstrate any prejudice resulting from her prior counsel's representation such as would affect the outcome of her case and would amount to a due process violation." Alternatively, the BIA considered the motion as a motion to reconsider and concluded that, "[t]o the extent that the current motion is subject to being construed as a motion to reconsider, we find that it must be denied because [Mohamed] has not demonstrated any substantive error in our [first] decision . . . ."

Mohamed petitioned for review of the BIA's decision denying her second motion. We granted her motion to consolidate review of the two orders denying her motions to reconsider and reopen. Two days before we heard oral argument, the government moved to remand the case so that the BIA could reconsider and clarify its decisions.[6]

---

[5]Although Mohamed alleges ineffective assistance only against her prior counsel, her current counsel has made numerous mistakes in the motions filed before the BIA and in her petition before this court. In addition to the "scribner's" mistake in the first motion, and the failure to file a timely appeal discussed in footnote 4 above, Mohamed's current attorney has filed two separate corrections to her brief because of deficiencies. Furthermore, even after the corrections were made, it appears that she failed to attach what she refers to as "Exhibit A" — evidence of Mohamed's request for a complete decision from the BIA on the first motion.

[6]Specifically, the government sought remand for the BIA to consider:

## II.  ANALYSIS

We have jurisdiction over Mohamed's petitions for review pursuant to 8 U.S.C. § 1252. We review BIA rulings on motions to reopen and reconsider for abuse of discretion and reverse only if the Board acted arbitrarily, irrationally, or contrary to law. *Salta v. INS*, 314 F.3d 1076, 1078 (9th Cir. 2002); *Singh v. INS*, 213 F.3d 1050, 1052 (9th Cir. 2000). We review factual findings for substantial evidence. *Lin v. Ashcroft*, 377 F.3d 1014, 1023 (9th Cir. 2004). Questions of law, including claims of due process violations due to ineffective assistance, we review de novo. *Id.*

A.  *Procedural issues*

As described above, Mohamed's case is characterized by a series of errors committed by the agency responsible for adjudicating her claim, and by her attorneys.[7] Before considering the question whether Mohamed has demonstrated ineffective assistance sufficient to warrant reopening, we must address the procedural complications raised by the "woefully inade-

---

1) whether [it] should reissue its [first] decision, or take other measures to ensure that the decision sets forth the intended statement of the agency on the petitioner's first motion to reopen, and 2) whether petitioner's second motion to reopen is barred by the numerical limitation on motions to reopen, in light of any action taken upon remand with regard to the [first] decision.

[7]We note that none of the "typographical," "scribner," or other errors that complicate our task appear to be the fault of Mohamed herself. As we have previously emphasized, "[t]he role of an attorney in the deportation process is especially important. For the alien unfamiliar with the laws of our country, an attorney serves a special role in helping the alien through a complex and completely foreign process." *Monjaraz-Munoz v. INS*, 327 F.3d 892, 897 (9th Cir. 2003). Furthermore, the obligation of counsel is greater where, as here, the client is a minor. *See Lin* v. *Ashcroft*, 377 F.3d 1014,1025 (9th Cir. 2004) ("[C]oncern about [due process] is intensified when the petitioner is a minor.").

quate" adjudication and representation below. *See Niam v. Ashcroft*, 354 F.3d 652, 654 (7th Cir. 2004).

Mohamed's first motion, which was filed as a motion to reconsider and remand, erroneously stated that Mohamed feared *future* female genital mutilation. Nonetheless, the attached documents, including Mohamed's affidavit and the physician's report, made clear that the claim was based on *past* persecution, and the motion unambiguously asked the BIA to consider her former counsel's ineffective assistance in failing to raise the mutilation issue. The BIA properly construed the motion as a motion to reopen. Our case law holds that a motion to reopen — not a motion to reconsider — is the proper "avenue ordinarily available to pursue ineffective assistance of counsel claims." *Iturribarria v. INS,* 321 F.3d 889, 896-97 (9th Cir. 2003) (instructing the BIA to treat motions based on ineffective assistance of counsel claims as motions to reopen); *see also Singh v. Ashcroft*, 367 F.3d 1182, 1185 (9th Cir. 2004).[8]

The BIA abused its discretion, however, by denying the motion in an incomplete opinion and in failing to consider all the attached evidence. The BIA's opinion was nonsensical: It referred to a direct appeal rather than to a motion to reconsider or reopen; the second page began mid-sentence and was unrelated to the first page, making the reasoning difficult to follow; and it stated that the new evidence *did* likely affect the outcome of Mohamed's case, even though it went on to deny the motion. Furthermore, the BIA treated the ineffective assistance claim in a cursory fashion and gave no indication that it considered either the significant documentary evidence

---

[8]A motion to reconsider does not present new law or facts, but rather challenges determinations of law and fact made by the BIA. 8 C.F.R. § 1003.2(b)(1); *see also Iturribarria*, 321 F.3d at 895-96; *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1180 n.2 (9th Cir. 2001) (en banc). In contrast, a motion to reopen seeks to present new facts that would entitle the alien to relief from deportation. *See* 8 C.F.R. § 1003.2(c); *see also Socop-Gonzalez*, 272 F.3d at 1180.

demonstrating Mohamed's past genital mutilation or her compliance with *Lozada*.

Not only was the BIA's opinion an example of sloppy adjudication, it contravened considerable precedent. We have held that the BIA must issue a decision that fully explains the reasons for denying a motion to reopen. *See Maravilla Maravilla v. Ashcroft*, 381 F.3d 855, 858 (9th Cir. 2004) ("This court has held that the BIA must 'indicate with specificity that it heard and considered petitioner's claims.' ") (quoting *Arrozal v. INS*, 159 F.3d 429, 433 (9th Cir. 1998)); *Rodriguez-Lariz v. INS*, 282 F.3d 1218, 1227 (9th Cir. 2002) (holding that the BIA abused its discretion where it "merely repeated petitioners' claims and summarily dismissed them without even purporting to engage in any substantive analysis or articulating any reasons for its decision."). Furthermore, the BIA is obligated to consider and address in its entirety the evidence submitted by a petitioner. *See Mejia v. Ashcroft*, 298 F.3d 873, 879-80 (9th Cir. 2002); *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001).

Were the first motion and decision the only materials before us, we would be inclined to grant the government's motion to remand and to order the BIA to "take measures to ensure that its decision sets forth the intended statement of the agency," as the government requests. *See Maravilla Maravilla*, 381 F.3d at 858 (remanding for reconsideration because the BIA's decision was "[s]o far afield of the proper two-pronged analysis . . . that it [wa]s unclear whether it actually treated petitioners' motion as an ineffective assistance of counsel claim."). In this case, however, the BIA has already had a second opportunity to address the claim and has done so. Mohamed filed a second motion in which she made it clear that her ineffective assistance claim was based on her *past* genital mutilation. Although the motion was improperly titled a motion to reopen, its purpose was to ask the BIA to reconsider its previous decision, and to make the BIA aware that it might have overlooked evidence in the record. In

response to this motion, the BIA issued an opinion in which it acknowledged the "typographical" mistakes in its prior opinion, and explained that it had found that Mohamed failed to demonstrate prejudice as the result of any ineffective representation. In the alternative, it considered the second motion as a motion to reconsider, and denied it on the basis that its initial decision was correct.

As cliché-lovers are wont to say, the BIA has already had two "bites at the apple," *see Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (Reinhardt, Circuit Judge, concurring), and has rendered its considered judgment regarding a lack of prejudice. The government's request to remand indicated no willingness to have the BIA reconsider the substance of that dispositive ruling. *See* note 6 *supra*. Accordingly, we now proceed to review the BIA's decisions on Mohamed's motions, including its second (corrected) decision in which it reaffirmed its earlier decision to refuse, on the ground of lack of prejudice, to allow Mohamed to reopen her proceeding on the ground of ineffectiveness of counsel.

B.   *Ineffective assistance of counsel claim*

**[1]** Although there is no Sixth Amendment right to counsel in a deportation proceeding, the due process guarantees of the Fifth Amendment "still must be afforded to an alien-petitioner." *Singh*, 367 F.3d at 1186. Ineffective assistance of counsel amounts to a violation of due process if "the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Maravilla Maravilla*, 381 F.3d at 858 (quoting *Lopez v. INS*, 775 F.2d 1015, 1017 (9th Cir. 1985)). To prevail, the petitioner must demonstrate first that counsel failed to perform with sufficient competence, and, second, that she was prejudiced by counsel's performance. *Id.* However, she need not show that the counsel's ineffectiveness definitively changed the outcome. Rather, prejudice results when "the performance of counsel was so

inadequate that it *may* have affected the outcome of the proceedings." *Ortiz v. INS*, 179 F.3d 1148, 1153 (9th Cir. 1999) (emphasis added).

A petitioner who seeks to reopen on the basis of ineffective assistance of counsel is usually expected to comply with the procedural guidelines set forth in *Matter of Lozada*, 19 I. & N. Dec. at 639 (requiring petitioner to submit an affidavit explaining his agreement with the former counsel, offer proof that prior counsel has been informed of the allegations and given an opportunity to respond, and show that a complaint against prior counsel was filed with the proper authorities); *see also Iturribarria*, 321 F.3d at 900.[9] Mohamed has done so: She included a declaration explaining her agreement with her first attorney, a letter from that attorney admitting that she had made a mistake, and a copy of the complaint form filed with the State Bar of California.

**[2]** The government does not contest Mohamed's assertion that her first counsel's performance was ineffective; rather, it argues only that counsel's performance did not prejudice her case. In order to assess whether Mohamed suffered prejudice, "[w]e must consider the underlying merits of the case to come to a tentative conclusion as to whether [her] claim, if properly presented, would be viable." *Lin*, 377 F.3d at 1027.[10] Thus,

---

[9]Notably, this court has rejected the BIA's position that compliance with *Lozada* is always necessary. *See Castillo-Perez v. INS*, 212 F.3d 518, 525 (9th Cir. 2000). For example, we have permitted ineffective assistance of counsel claims to go forward "when there is substantial compliance with *Lozada* such that the purpose of *Lozada* is fully served by other means." *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 824-25 (9th Cir. 2003) (internal quotation marks and citation omitted), and when the facts are plain on the face of the administrative record. *See, e.g.*, *Castillo-Perez*, 212 F.3d at 525; *Escobar-Grijalva v. INS*, 206 F.3d 1331, 1335 (9th Cir. 2000).

[10]Because Mohamed's genital mutilation claim is supported by documentary evidence — medical evidence of her genital mutilation, State Department Reports, and a letter from her prior counsel admitting her mistake — her motion to reopen does not hinge on her credibility.

the question before us is whether first counsel's failure to present evidence of Mohamed's past genital mutilation "may have affected the outcome of the proceedings." *Iturribarria*, 321 F.3d at 900 (quotation marks and citation omitted); *see also Munoz v. Ashcroft*, 339 F.3d 950, 955 (9th Cir. 2003). Mohamed must demonstrate only that she has *plausible* grounds for relief. *Lin*, 377 F.3d at 1027. "We need not conclude that [she] would win or lose on any claim, only that [her] claims merit full consideration by the BIA." *Id.*[11] We thus examine whether first counsel failed to present *plausible* claims for relief when she failed to introduce evidence of past female genital mutilation in support of Mohamed's asylum, withholding, and CAT applications.

a) *Asylum*

    i. *Past Persecution*

**[3]** To establish eligibility for asylum on the basis of past persecution, Mohamed "must show: (1) an incident . . . that rise[s] to the level of persecution; (2) that [wa]s 'on account of' one of the statutorily-protected grounds; and (3) [wa]s committed by the government or forces the government is either 'unable or unwilling' to control." *Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000). We address each element in turn.

First, we have no doubt that the range of procedures collectively known as female genital mutilation rises to the level of

---

[11]In its brief, the government argues that the standard we should apply in reviewing Mohamed's ineffective assistance of counsel claim is whether "the record evidence compels the conclusion that raising her FGM claims to the immigration judge and to the Board *would* have been sufficient to establish her eligibility . . . ." (emphasis added). However, this assertion is contrary to the law of this circuit. As discussed above, this court has consistently held that Mohamed need only establish that her prior counsel's ineffective assistance *may* have affected her case.

persecution within the meaning of our asylum law.[12] As the Seventh Circuit has written, the mutilation of women and girls is "a horrifically brutal procedure, often performed without anesthesia" that causes both short- and long-term physical and psychological consequences. *Nwaokolo v. INS*, 314 F.3d 303, 308 (7th Cir. 2002) (per curiam). The practice has been internationally recognized as a violation of the rights of women and girls.[13] Within the United States, the practice of genital

---

[12]The Department of State has classified, based on World Health Organization typology, the prevalent forms of female genital mutilation. Type I, commonly referred to as "clitoridectomy," is the removal "of the clitoral hood with or without removal of all or part of the clitoris." Type II, commonly referred to as "excision," is the removal "of the clitoris together with part or all of the labia minora." Type III, commonly referred to as "infibulation," is the removal "of part or all of the external genitalia (clitoris, labia minora and labia majora) and stitching or narrowing of the vaginal opening, leaving a very small opening, about the size of a matchstick, to allow for the flow of urine and menstrual blood." Prevalence of the Practice of Female Genital Mutilation (FGM); Laws Prohibiting FGM and Their Enforcement; Recommendations on How to Best Work to Eliminate FGM, U.S. Dept. of State, *Report on Female Genital Mutilation*, at 5 (updated June 27, 2001), *available at* http://www.state.gov/g/wi/rls/rep/c6466.htm. Type II (excision) is the most widely practiced form. *Id.* It appears from the physician's report in the record that Mohamed experienced Type I in its complete form.

[13]*See, e.g.*, Report of the Committee on the Elimination of All Forms of Discrimination Against Women, General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38 & Corr. 1, at 80, ¶ 438, U.N. Doc. A/45/38 (1990); Declaration on the Elimination of Violence Against Women, G.A. Res. 104, U.N. GAOR, 48th Sess., Art. 2(a), U.N. Doc. A/48/629 (1993) (including female genital mutilation as an example of violence covered by the resolution); Traditional or Customary Practices Affecting the Health of Women and Girls, G.A. Res. 128, U.N. GAOR, 56th Sess., Supp. 49, at 2, U.N. Doc. A/RES/56/128 (2001) (reaffirming that female genital mutilation "constitute[s] a definite form of violence against women and girls and a serious violation of their human rights"). Australia, Canada, France, New Zealand, Sweden, and the United Kingdom all criminalize the practice. *See* Report on Female Genital Mutilation as Required by Conference Report (H. Rept. 106-997) to Pub. L. 106-429 (Foreign Operations, Export Financing and Related Programs Appropriations Act, 2001) at 25-27.

mutilation of female minors has been prohibited by federal law since 1996. *See* 18 U.S.C. § 116(a) (providing that whoever "knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained 18 years" shall be fined or imprisoned for up to five years). In making such mutilation a criminal offense, Congress found that the procedure "often results in the occurrence of physical and psychological health effects that harm the women involved." Pub. L. 104-208, § 645(a), 110 Stat. 3009-546 (1996).

**[4]** Furthermore, the BIA has held that female genital mutilation constitutes "persecution within the meaning of section 101(a)(42)(A) of the [Immigration and Naturalization] Act, 8 U.S.C. § 1101(a)(42)(A)," *Kasinga*, 21 I. & N. Dec. at 365, as have several courts of appeals. *See, e.g.*, *Abay*, 368 F.3d at 638 ("Forced female genital mutilation involves the infliction of grave harm constituting persecution . . . ."); *Abankwah,* 185 F.3d at 23 ("That FGM involves the infliction of grave harm constituting persecution under Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994), is not disputed here."); *cf. Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004) ("The Agency does not dispute, at least with any force, that the type of FGM which [petitioner] has alleged is 'persecution.' "). Although this circuit has not yet ruled on whether female genital mutilation rises to the level of persecution,[14] we have "consistently found persecution where, as here, the petitioner was physically harmed." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir. 1999); *see also Chand v. INS*, 222 F.3d 1066, 1073-74 (9th Cir. 2000). Furthermore, "[p]ersecution may be emotional or psychological, as well as

---

[14]In one recent case, we were presented with a claim of female genital mutilation but did not express an opinion on the merits of the claim. *Azanor v. Ashcroft*, 364 F.3d 1013 (9th Cir. 2004). In another, we were confronted with a related issue, but that case was taken en banc in an order prohibiting its citation as precedent. *Abebe v. Gonzales*, slip op. at 2911 (9th Cir. March 3, 2005) (order).

physical." *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004). Indeed, we have held that a forced pregnancy examination, which does not necessarily involve physical injury nor result in the same permanent health effects as genital mutilation, constitutes persecution. *See Li v. Ashcroft*, 356 F.3d 1153, 1158 & n.4 (9th Cir. 2004) (en banc) (involving a "crude" and "physically invasive" exam performed without petitioner's consent). In sum, the extremely painful, physically invasive, psychologically damaging and permanently disfiguring process of genital mutilation undoubtedly rises to the level of persecution.[15]

[5] The second question is whether Mohamed's subjection to mutilation was "on account of" one of the statutorily protected grounds. This circuit has not yet ruled on whether female genital mutilation occurs "on account of" a protected ground. However, other circuits, as well as the BIA, have recognized that female genital mutilation "constitut[es] persecution *on account of membership in a particular social group . . . .*" *See Abay*, 368 F.3d at 638 (emphasis added) (citing *Kasinga*, 21 I. & N. Dec. at 365); *Abankwah*, 185 F.3d at 21, 23-25 (noting that the BIA "did not dispute that [petitioner's] fear of genital mutilation was on account of her membership in a cognizable social group" and holding that petitioner had

---

[15]We reject the government's suggestion that female genital mutilation cannot be a basis for a claim of past persecution because it is "widely-accepted and widely-practiced." The fact that persecution is widespread "does not alter our normal approach to determining refugee status or make a particular asylum claim less compelling," *Ndom v. Ashcroft*, 384 F.3d 743, 752 (9th Cir. 2004); nor does its cultural acceptance. Persecution "simply requires that the perpetrator cause the victim suffering or harm" and does not require "that the perpetrator believe[ ] the victim has committed a crime or some wrong." *Pitcherskaia v. INS*, 118 F.3d 641, 647-48 (9th Cir. 1997). "Whether an act is or is not persecution cannot depend on whether it is rational . . . from the point of view of the persecutors." *Montecino v. INS*, 915 F.2d 518, 520 (9th Cir. 1990). In addition, the consent or involvement of Mohamed's parents in the procedure would not change the analysis. *See Faruk v. Ashcroft*, 378 F.3d 940, 943 (9th Cir. 2004) (holding that violence by family members can constitute persecution).

demonstrated a well-founded fear of future mutilation); *see also Balogun*, 374 F.3d at 499 (noting that the agency conceded that female genital mutilation constitutes persecution on account of membership in a particular social group). We have no doubt that these decisions correctly reflect the law.

In this case, there are at least two ways in which the agency could define the social group to which Mohamed belongs. First, it could determine that she was persecuted because of her membership in the social group of young girls in the Benadiri clan. *See Kasinga*, 21 I. & N. Dec. at 367-368 (holding that the persecution the applicant feared was " 'on account of' her status as a member of a particular social group consisting of young women of [her tribe] who have not yet had FGM . . . and oppose the practice.").**[16]** Alternatively, because the practice of female genital mutilation in Somalia is not clan specific, but rather is deeply imbedded in the culture throughout the nation and performed on approximately 98 percent of all females, the agency could define the social group as that of Somalian females.

**[6]** Although we have not previously expressly recognized females as a social group,**[17]** the recognition that girls or

---

**[16]**The BIA's decision in *Kasinga* defined the social group in terms of gender and clan membership but also put emphasis on the women's shared opposition to the persecutory conduct. We believe that opposition is not required in order to meet the "on account of" prong in female genital mutilation cases. The persecution at issue in these cases — the forcible, painful cutting of a female's body parts — is not a result of a woman's opposition to the practice but rather a result of her sex and her clan membership and/or nationality. That is, the shared characteristic that motivates the persecution is not opposition, but the fact that the victims are female in a culture that mutilates the genitalia of its females. *Cf. INS v. Elias-Zacarias*, 502 U.S. 478, 481-82 (1992) (focusing on the persecutor's motive to decide the "on account of" prong); *see also* Deborah Anker, *The Law of Asylum in the United States* at 390, n. 720 (3d ed. 1999).

**[17]***Cf. Fisher v. INS*, 79 F.3d 955, 965-66 (9th Cir. 1996) (en banc) (Canby, Circuit Judge, concurring) (explaining that, in denying asylum petition, court had not reached the issue of whether persecution on account of gender could constitute persecution on account of membership in a social group); *The Law of Asylum* at 367 (arguing that "U.S. law is unfortunately under-developed in th[e] area" of gender persecution).

women of a particular clan or nationality (or even in some circumstances females in general) may constitute a social group is simply a logical application of our law. We have held "that a 'particular social group' is one united by a voluntary association . . . *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (emphasis in original) (recognizing that persecution on account of homosexuality can constitute persecution on account of membership in a particular social group). Few would argue that sex or gender, combined with clan membership or nationality, is not an "innate characteristic," "fundamental to individual identit[y]." Indeed, in *In re Acosta,* 19 I. & N. Dec. 211, 233 (BIA 1985)*, overruled in part on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987), the BIA listed gender as an example of a prototypical immutable characteristic that could form the basis for a social group. *See also Hernandez-Montiel*, 225 F.3d at 1094-1095 ("[S]exual orientation and sexual identity can be the basis for establishing a 'particular social group,' "); *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (holding that persecution based on gender may constitute persecution based on membership in a particular social group). In addition, the agency's own "Gender Guidelines," which provide Asylum Officers with guidance on adjudicating women's claims of asylum, state that gender is an immutable trait that can qualify under the rubric of "particular social group." INS Office of International Affairs, *Gender Guidelines, Considerations for Asylum Officers Adjudicating Asylum Claims From Women,* at 4 (May 26, 1995) [hereinafter INS Gender Guidelines]. Finally, the Office of the United Nations High Commissioner for Refugees has made clear that "women may constitute a particular social group under certain circumstances based on the common characteristic of sex, whether or not they associate with one another based on that shared characteristic." UNHCR, *Guidelines on International Protection: Membership of a*

*Particular Social Group*, at 4 (HCR/GIP/02/02, 7 May 2002).**[18]** Its analysis provides significant guidance for issues of refugee law. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987).

**[7]** Moreover, there is little question that genital mutilation occurs to a particular individual *because* she is a female. That is, possession of the immutable trait of being female is a motivating factor — if not a but-for cause — of the persecution. Indeed, the BIA has recognized that female genital mutilation is a form of gender-based persecution, explaining that female genital mutilation "is practiced, at least in some significant part, to overcome sexual characteristics of young women" and "to control women's sexuality." *Kasinga*, 21 I. & N. Dec. at 367-368; *see also* INS Guidelines at 4-5 (recognizing that genital mutilation is a form of mistreatment that occurs on account of gender and that may constitute past persecution).

**[8]** In short, we conclude that Mohamed's claim that she was persecuted "on account of" her membership in a social group, whether it be defined as the social group comprised of Somalian females, or a more narrowly circumscribed group, such as young girls in the Benadiri clan, not only reflects a plausible construction of our asylum law, but the only plausible construction.

**[9]** Finally, on remand, Mohammed would almost certainly be able to demonstrate that the government of Somalia was unable or unwilling to control her persecution. The State Department reports in the record explain that female genital mutilation "is a near-universal practice." Although the former government adopted a policy favoring the eradication of female genital mutilation in 1988, the central authority in Somalia subsequently fell and the policy was never implemented. There is currently no law outlawing the practice. *Country Report* at 13; *Profile* at 31. Consequently, "[t]here

---

**[18]***See also* UNHCR, *Guidelines on International Protection: Gender-Related Persecution* (HCR/GIP/02/01, 7 May 2002).

does not appear to be any effective protection at present from FGM for an unwilling woman or girl." *Profile* at 31.[19]

### ii. *Government's rebuttal burden*

**[10]** Once a petitioner demonstrates past persecution within the definition of the Act, she is entitled to a presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1)(i). The government must then rebut that presumption by demonstrating by a preponderance of evidence that circumstances have fundamentally changed or that relocation is possible, so that the petitioner no longer has a well-founded fear that she would be persecuted. *Id.*; *see also Mamouzian v. Ashcroft*, 390 F.3d 1129, 1135 (9th Cir. 2004); *Baballah v. Ashcroft*, 335 F.3d 981, 992 (9th Cir. 2003).

The government argues, quoting *Oforji v. Ashcroft*, 354 F.3d 609, 615 (7th Cir. 2003), that Mohamed cannot be eligible for asylum because she has already suffered genital mutilation and therefore, "there is no chance that she would be personally tortured again by the procedure."[20] That is, the government contends that the presumption of a well-founded fear of future persecution is automatically rebutted because

---

[19]The record before us does not indicate who mutilated Mohamed. If, as the documentary evidence indicates is likely, it was her family members or fellow clan members her claim is nevertheless valid. "Indeed we have previously recognized that a person can be persecuted by members of the same group." *Maini v. INS*, 212 F.3d 1167, 1174 (9th Cir. 2000) (citing *Andriasian v. INS*, 180 F.3d 1033 (9th Cir. 1999)). Furthermore, "[t]here is no exception to the asylum statute for violence from family members; if the government is unable or unwilling to control persecution, it matters not who inflicts it." *Faruk v. Ashcroft*, 378 F.3d 940, 943 (9th Cir. 2004).

[20]In *Azanor*, 364 F.3d 1013, we cited the Seventh Circuit's opinion in *Oforji*, 354 F.3d 609, but only when setting forth the government's arguments opposing petitioner's Convention Against Torture claim. *Azanor*, 364 F.3d at 1020. We did not adopt the Seventh Circuit's reasoning. Rather, we remanded the case to the BIA, because it had applied the wrong legal standard and provided only cursory analysis of the CAT claim.

the persecution has already occurred and will not be repeated. The government's position is not supported by either the BIA's precedent or our own opinions in analogous circumstances. In fact, there are several reasons why the agency and the court would be compelled to conclude that the government has failed to rebut the presumption of a well-founded fear of future persecution.

The primary reason that such a conclusion is necessary is that persecution in the form of female genital mutilation is similar to forced sterilization and, like that other persecutory technique, must be considered a continuing harm that renders a petitioner eligible for asylum, without more. That is, the individual who endures sterilization does not need to have a fear of the same persecution recurring in the future in order to be eligible for withholding of removal. *See Qu v. Gonzales*, slip op. at 2933 (9th Cir. March 8, 2005); *In re Y-T-L*, 23 I. & N. Dec. 601 (BIA 2003).[21] Rather, we have held that forced sterilization "should not be viewed as a discrete, onetime act, comparable to a term in prison, or an incident of severe beating or even torture. Coerced sterilization is better viewed as a permanent and continuing act of persecution that has deprived a couple of the natural fruits of conjugal life . . ." *Qu*, slip op. at 2946 (quoting *In re Y-T-L*, 23 I. & N. Dec. at 606). "[S]uch a permanent and continuing form of persecution requires a special result under the asylum regulations, namely that applicants who have suffered forced or involuntary sterilization necessarily have an inherent well-founded fear of

---

[21]Although "a completed sterilization removes any reasonable, objective basis on which to fear a future act of coerced abortion or sterilization," *In re Y-T-L*, 23 I. & N. at 606, both the BIA and this court have rejected the "anomalous result that the act of persecution itself would also constitute the change in circumstances that would result in the denial of asylum to such persons." *In re Y-T-L*, 23 I. & N. Dec. at 605; *see also Qu*, slip op. at 2945. The government urges the same anomalous result in this case: that Mohamed's experience of genital mutilation should constitute the change in circumstances that would result in the denial of her asylum claim.

future persecution because such persons will be persecuted for the remainder of their lives." *Qu*, slip op. at 2946; *see also Ge v. Ashcroft*, 367 F.3d 1121, 1127 (9th Cir. 2004); *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003).

Like forced sterilization, genital mutilation permanently disfigures a woman, causes long term health problems, and deprives her of a normal and fulfilling sexual life.[22] The World Health Organization reports that even the least drastic form of female genital mutilation can cause a wide range of complications such as infection, hemorrhaging from the clitoral artery during childbirth, formation of abscesses, development of cysts and tumors, repeated urinary tract infections, and psuedo infibulation. *See* World Health Organization, *Female Genital Mutilation: An Overview* at 14-15 (1998). Many women subjected to genital mutilation suffer psychological trauma. *Id.* at 15-17. In addition, it "can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions." *Kasinga*, 21 I. & N. Dec. at 361; *see also Abay*, 368 F.3d at 638. Thus, "[i]n addition to the physical and psychological trauma that is common to many

---

[22]We recognize that forced sterilization, unlike female genital mutilation, is expressly recognized as past persecution by the INA. *See* INA § 101(a)(42), 8 U.S.C. § 1101(a)(42) (stating that a person who has been forced to abort a pregnancy or to undergo involuntary sterilization "shall be deemed to have been persecuted on political opinion."). However, the statute, which was enacted in order to overcome BIA rulings to the effect that forced abortions and sterilizations did not constitute persecution on account of one of the five reasons enumerated in the INA, *see Qu*, slip op. at 2946-47 (discussing legislative history), does *not* in its text provide for automatic asylum upon a showing of *past* sterilization. Rather, the principle that the fact of sterilization cannot be used by the government to rebut the fear of future harm was developed by the BIA and the courts after the legislation was enacted as a recognition of the special, continuing, and permanent nature of coercive population control. Thus, assuming that Mohamed's experience constitutes past persecution on account of a protected ground — a subject that, unlike sterilization, is not expressly addressed by statute — the reasoning in the forced sterilization cases would appear to apply equally to the case of genital mutilation.

forms of persecution [female genital mutilation] involves drastic and emotionally painful consequences that are unending." *See Qu*, slip op. at 2946. Therefore, our precedent compels the conclusion that genital mutilation, like forced sterilization, is a "permanent and continuing" act of persecution, which cannot constitute a change in circumstances sufficient to rebut the presumption of a well-founded fear.

Alternatively, even were female genital mutilation not analogous to forced sterilization and therefore the presumption of a well-founded fear was rebuttable, the government might have some difficulty in establishing that Mohamed would not be subjected to further violence that is related to her past persecution, given the conditions in Somalia. As discussed above, the BIA has recognized that female genital mutilation is not simply an isolated act of violence but rather a form of gender persecution, practiced to overcome sexual characteristics of young women. *Kasinga*, 21 I. & N. Dec. at 367-68. The State Department Reports in the record make clear that the subordination and persecution of women in Somalia is not limited to genital mutilation. Rather, "[w]omen are subordinated systematically in the country's overwhelmingly patriarchal culture," and "[r]ape is commonly practiced in inter-clan conflicts." *Country Report* at 11. As a member of the minority Benadiri clan, Mohamed is "especially vulnerable to attack" and has "little or nothing to which to return." *Profile* at 15; *see also Awale v. Ashcroft*, 384 F.3d 527, 531 (8th Cir. 2004) (explaining that Somalian women of minority clans "who lack the protection of powerful clan structures or who belong to particularly vulnerable groups, such as ethnic minorities, are particularly at risk.").

Indeed, Mohamed might also be at risk of further genital mutilation. According to the State Department Report, approximately 80 percent of Somalian women "are subjected to infibulation," where an "incision is made in the [genital] lips so that raw surfaces can be stitched together covering the urethra and most of the vagina." *Country Report* at 11; *Profile*

at 18. The physician's report in the record indicates that Mohamed's clitoris and prepuce have been cut off but she has not been subjected to infibulation. Reports in the record further indicate that, in Somalia, "extramarital sex is completely unacceptable and FGM is used to ensure that it does not occur." *World Health Report* at 3. Mohamed, though unmarried, is currently using birth control, raising the possibility that on remand she could demonstrate that she is at risk for further genital mutilation, specifically infibulation, because she has engaged in extramarital sex. *See Abankwah*, 185 F.3d at 25-26 (holding that a Ghanian woman who feared genital mutilation as punishment for extra-marital sex was eligible for asylum).

**[11]** In sum, because female genital mutilation is, like forced sterilization, a "permanent and continuing" act of persecution, our precedent dictates the conclusion that the presumption of well founded fear in such cases cannot be rebutted. *Cf. Qu*, slip op. at 2947. Although the alternative reasons may be less compelling and are not as clearly mandated by existing precedent, we think that they too present plausible explanations for why the presumption would prove dispositive in Mohamed's case.

  iii. *Humanitarian exception*

**[12]** Even if the presumption of a well-founded fear of future persecution were rebuttable, Mohamed might still succeed in obtaining asylum on remand. Under the humanitarian exception, a victim of past persecution may be granted asylum even without a fear of related future persecution, if the applicant establishes (1) compelling reasons for being unwilling or unable to return because of the severity of the past persecution, 8 C.F.R. § 1208.13(b)(1)(iii)(A), or (2) a reasonable possibility that she may suffer other serious harm upon returning to that country, 8 C.F.R. § 1208.13(b)(1)(iii)(B). *See Belishta v. Ashcroft*, 378 F.3d 1078, 1081 (9th Cir. 2004) (remanding for consideration of humanitarian grant where fear of future

harm was not related to a protected ground); *Lal v. INS*, 255 F.3d 998, 1003, 1008-10, *as amended by* 268 F.3d 1148 (9th Cir. 2001) (holding petitioner eligible for asylum on the basis of severe past persecution under the humanitarian exception, even though he suffered from no continuing disability).

Mohamed may qualify under either of these exceptions. First, as detailed above, female genital mutilation is a particularly severe form of past persecution because of its many continuing effects. Second, as discussed previously, Mohamed might be at risk for other harm, because the Benadiri clan has been so decimated by violence, leaving its female members particularly vulnerable. Moreover, according to the State Department Reports the human rights situation in Somalia generally "is poor, and serious human rights abuses continued throughout the year . . . . Many civilian citizens were killed in factional fighting . . . ." *Country Report* at 2; *see also Ali v. Ashcroft*, 346 F.3d 873, 885-86 (9th Cir. 2003) (recognizing that Somalia lacks a central government and that human rights abuses are rampant), *overruled sub silentio on other grounds in Jama v. Immigration & Customs Enforcement*, 125 S. Ct. 694 (2005). Thus, it is plausible that on remand the BIA could grant Mohamed humanitarian asylum on the basis of either the severity of her past persecution or the possibility that she may suffer other serious harm upon return.

(b) *Withholding of Removal*

**[13]** Mohamed has also demonstrated a plausible claim for withholding of removal. *See* 8 C.F.R. § 1208.16(b). Just as we have held that an act of continuing persecution in the form of forced sterilization gives rise to statutory eligibility for asylum, we have held that a petitioner who has suffered such harm is also entitled, without more, to withholding of removal. *Qu*, slip op. at 2935-36. "[S]he need make no further showing or meet any further conditions nor requirements in order to obtain such relief." *Id*. This holding would appear equally applicable to Mohamed's experience of genital muti-

lation. Similarly, for all the other reasons we found that Mohamed is likely eligible for asylum, she is likely entitled to withholding.

(c)   *Convention Against Torture*

**[14]** Mohamed's claim for protection under the Convention Against Torture is also plausible, although less clearly so. The mutilation of her genitals might well be found to fall within the definition of torture as set forth in the implementing regulations. Specifically, Mohamed could plausibly demonstrate that she suffered an "act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted . . . with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1); *see Azanor*, 364 F.3d at 1019 (holding that the Board abused its discretion in denying petitioner's motion to reopen under CAT when it required petitioner to demonstrate a public official's prospective custody or physical control); *Oforji*, 354 F.3d at 615 n.2 ("It is undisputed that FGM as practiced in Nigeria constitutes 'torture' within the meaning of the CAT." (citing *Nwaokolo*, 314 F.3d at 308-09)).

**[15]** One difficulty with a torture claim is that, unlike in the case of asylum and withholding, the showing of past torture does not give rise to a regulatory presumption of fear of future torture. *See* 8 C.F.R. § 1208.16(c)(3). Nevertheless, Mohamed might well prevail on this claim as well: The regulations provide that evidence of past torture should be considered in deciding the question of future torture, 8 C.F.R. § 1208.16(c)(3)(i), and they instruct the adjudicator to consider "evidence of gross, flagrant or mass violations of human rights within the country of removal." *See* 8 C.F.R. § 1208.16(c)(3)(iii). *See also Kamalthas*, 251 F.3d at 1282. In light of Mohamed's past experience with female genital mutilation and the widespread practice of mutilating females in

Somalia, the possibility of related harm occurring in the future, and the overall human rights conditions in Somalia, Mohamed may well be able to demonstrate that she is entitled to relief under CAT. Certainly, she has a plausible argument to that effect. Moreover, as in the case of persecution, Mohamed may be entitled to protection under CAT on the ground that genital mutilation is a permanent and continuing harm. That is, to the extent that Mohamed's past genital mutilation constitutes torture, her ongoing experience may be enough to establish that she is automatically entitled, without more, to protection under CAT. *Cf. Qu*, slip op. at 2935-36 (holding petitioner automatically entitled to withholding on the basis of continuing persecution). Therefore, we hold that on remand the agency must consider Mohamed's CAT claim, along with her asylum and withholding claims.

## IV. CONCLUSION

Because Mohamed has demonstrated that she was prejudiced by her attorney's ineffective assistance, the BIA abused its discretion in denying her motions to reopen and reconsider. We grant her petition for review and remand with instructions to grant the motion to reopen.

**GRANTED AND REMANDED.**