**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRIDOON ZALBEG RAWSHAN NEHAD,
                    *Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,
                    *Respondent.*

No. 07-70606

Agency No.
A55-398-900

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 8, 2008—Pasadena, California

Filed July 31, 2008

Before: William A. Fletcher and Ronald M. Gould,
Circuit Judges, and Louis H. Pollak,* Senior District Judge.

Opinion by Judge Pollak

---

*Honorable Louis H. Pollak, Senior District Judge of the United States
District Court for the Eastern District of Pennsylvania, sitting by designa-
tion.

## COUNSEL

Christy A. Choteau, Aguirre Law Group, San Diego, California, for the petitioner.

Jacob A. Bashyrov, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for the respondent.

**OPINION**

POLLAK, District Judge:

Fridoon Zalbeg Rawshan Nehad ("Rawshan") petitions for review of an order denying his motion to reopen removal proceedings on the basis of ineffective assistance of his counsel, Pieter Speyer. This is an atypical ineffective-assistance claim, inasmuch as counsel's alleged ineffectiveness derived not from the giving of incompetent advice, but from pressuring his client into accepting voluntary departure under threat of counsel's withdrawal. For the reasons that follow, we will grant the petition for review and remand with instructions to the Board of Immigration Appeals ("BIA") to reopen petitioner's case.

## I. Facts and procedural history

Rawshan is a citizen and native of Afghanistan and a lawful permanent resident of the United States. He fled Afghanistan in 1989 at age 16 to avoid military service and settled in Germany. In 2003, he immigrated to the United States as a lawful permanent resident to live with other members of his family. He has been diagnosed with schizophrenia and bipolar disorder, and, when not properly medicated, he experiences hallucinogenic episodes.

In June 2005, the government served Rawshan with a notice to appear alleging that he was removable under 8 U.S.C. § 1227(a)(2)(E)(i) as an alien convicted of a crime of domestic violence. Rawshan retained attorney Pieter Speyer to represent him in removal proceedings. In July 2005, the government lodged an additional charge that Rawshan was removable under 8 U.S.C. § 1227(a)(2)(E)(ii) as an alien convicted of violating a protective order. In support of these charges, the government submitted California court documents reflecting that, in February 2005, Rawshan pleaded guilty to one count of battery in violation of California Penal

Code § 242 and one count of violating a protective order in violation of California Penal Code § 273.6(a). The documents of conviction do not detail the circumstances of these charges. According to an affidavit submitted by Rawshan's sister, Benazeer Roshan, she and other family members obtained the protective order in response to one of Rawshan's psychotic episodes. They were, at the time, unaware of Rawshan's mental illnesses. Roshan further attests that had they realized his episode was the product of mental illness, they would not have requested the order. How Rawshan violated the protective order is not reflected in the record.

At a master calendar hearing in December 2005, the Immigration Judge ("IJ") issued a preliminary ruling sustaining the § 1227(a)(2)(E)(ii) charge (for violating a protective order) and rejecting the § 1227(a)(2)(E)(i) charge (for a crime of domestic violence). The record does not contain a transcript of the hearing or anything else detailing the reasons underlying the IJ's decision.

Following these preliminary rulings, the December 2005 hearing was continued to allow Rawshan to prepare an application for asylum and similar relief. The next hearing was set for February 14, 2006, and Rawshan was expected to file any applications for relief from removal at that time.

On February 14, 2006, shortly before Rawshan was scheduled to appear before the IJ, he met with Speyer to finalize his asylum application. According to Rawshan's account of the meeting, Speyer announced that he would not be able to continue representing Rawshan beyond that day's hearing because of a personal issue[1] and because Rawshan's case was complicated. In addition, Rawshan attests that Speyer suggested that his claim for asylum was weak. Approximately two hours before the hearing, Speyer proposed that, in lieu of filing an asylum application, Rawshan accept voluntary

---

[1]According to Rawshan, Speyer said that his wife was ill.

departure, which, Speyer told Rawshan, would preserve Rawshan's rights to return to the United States in the future. At the hearing that day, Rawshan agreed to voluntary departure and was given 60 days to leave the United States.

Days before his deadline for leaving the United States, Rawshan, through new counsel, filed a motion to reopen based on Speyer's ineffective assistance. Rawshan's primary argument was that Speyer acted improperly by presenting him with a voluntary-departure proposal and a threat to withdraw as counsel just two hours before a scheduled hearing. Rawshan further argued that he was prejudiced by this impropriety because, in agreeing to voluntary departure, he waived a meritorious appeal on the issue of removability and forewent the filing of a meritorious application for asylum and related relief. In support of his motion, Rawshan submitted an affidavit in which he testified to Speyer's conduct. He also submitted a complaint against Speyer filed with the California Bar Association by his sister, Benazeer Roshan, and an affidavit from her as well, both of which enlarged upon the testimony in Rawshan's affidavit.[2] In support of his motion to reopen, Rawshan included Speyer's brief response to the bar complaint, in which Speyer stated that he "perceived a conflict between Ms. Roshan's plan for resolving this case and her brother, Fridoon Rawshan's, own wishes," and that seeking voluntary departure appeared to reconcile "everyone's wishes."

The IJ denied Rawshan's motion, ruling that the evidence submitted did not establish that Speyer sought to withdraw from the case for personal reasons. The IJ observed that Speyer had not moved to withdraw, and that Speyer had completed Rawshan's asylum application, which, according to the IJ, suggested that Speyer was prepared to file an asylum request had Rawshan wanted him to do so. The IJ essentially

---

[2]Ms. Roshan is an attorney and appears to be one of the family members who paid for Speyer's services.

credited Speyer's explanation that there was some conflict between Rawshan and his sister, and inferred that Speyer followed his client's wishes by requesting voluntary departure. The IJ further found that Rawshan's conduct during the February 14, 2006, hearing suggested that Rawshan fully understood the consequences of accepting voluntary departure.[3]

Rawshan appealed to the BIA, and the BIA affirmed, adopting the IJ's view and adding its own. In his appeal to the BIA, Rawshan also requested reopening on the ground of changed country conditions and reconsideration of his removability. The BIA concluded that it lacked jurisdiction over both supplemental requests.

Rawshan petitions this court for review of the BIA's affirmance of the IJ's denial of his motion to reopen, as well as the BIA's refusal to consider his supplemental requests for reconsideration and for reopening on the basis of changed country conditions.

## II. Jurisdiction and standard of review

We have jurisdiction under 8 U.S.C. § 1252(a).

Where, as here, the BIA expressly adopts the reasoning of the IJ and adds some of its own reasoning, we review both decisions. *Nuru v. Gonzales*, 404 F.3d 1207, 1215 (9th Cir. 2005). "We review the denial of a motion to reopen for abuse of discretion." *Perez v. Mukasey*, 516 F.3d 770, 773 (9th Cir. 2008). Any findings of fact made in the course of the decision are reviewed for substantial evidence. *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1024 (9th Cir. 2004) (as amended). The BIA's decision not to consider a motion on jurisdictional grounds is reviewed *de novo*. *Lin v. Gonzales*, 473 F.3d 979, 981 (9th Cir. 2007).

---

[3]It would seem that the IJ must have been relying on his recollection of the February 14, 2006, hearing, since, as noted above, the administrative record contains no transcript of that proceeding.

## III. Discussion

**[1]** We begin with the denial of Rawshan's motion to reopen on account of ineffective assistance of counsel. Litigants in removal proceedings have no Sixth Amendment right to counsel; their counsel can, however, be so ineffective as to deprive them of their Fifth Amendment right to due process of law. *Blanco v. Mukasey*, 518 F.3d 714, 722 (9th Cir. 2008). The Immigration and Nationality Act gives litigants in removal proceedings a right to retain private counsel. 8 U.S.C. § 1362. "[I]f an individual chooses to retain counsel, his or her due process right 'includes a right to *competent representation.*' " *Hernandez v. Mukasey*, 524 F.3d 1014, 1017 (9th Cir. 2008) (quoting *Ray v. Gonzales*, 439 F.3d 582, 587 (9th Cir. 2006) (emphasis in original)). Representation by competent counsel is particularly important in removal proceedings because "[t]he proliferation of immigration laws and regulations has aptly been called a labyrinth that only a lawyer could navigate." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005). Thus, we have recognized that litigants in removal proceedings rely heavily on their attorney's advice. *See Hernandez*, 524 F.3d at 1018.

**[2]** "Ineffective assistance of counsel amounts to a violation of due process if 'the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.' " *Mohammed v. Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005) (citations omitted). To make out an ineffective assistance claim, an immigrant must show (1) that counsel's performance was deficient, and (2) that counsel's deficiency caused prejudice. *Id.* at 793-94. Prejudice only results when counsel's performance is "so inadequate that it may have affected the outcome of the proceedings." *Ortiz v. INS*, 179 F.3d 1148, 1153 (9th Cir. 1999).

### A. Whether Speyer's performance was deficient

The focus of Rawshan's petition is not that Speyer's advice recommending voluntary departure was *per se* incompetent,

but that Speyer violated his duties of loyalty and competence by presenting this recommendation under improperly coercive circumstances. In particular, Rawshan argues that it was improper for Speyer to, in effect, threaten to withdraw from the case if Rawshan refused to accept voluntary departure.

**[3]** At the outset, we note that it is unclear what the IJ thought happened at the February 14, 2006, meeting between Rawshan and Speyer. The IJ found as follows: "The respondent [Rawshan] has not established that Attorney Speyer requested voluntary departure on the respondent's behalf for his own personal reasons and out of a desire to withdraw from the case." This statement is unhelpful, because it is does not explain whether the IJ disbelieved that Speyer intended to withdraw at all, or merely disbelieved that Speyer's voluntary-departure recommendation was tainted by his desire to withdraw from the case. No matter. We accept petitioner's testimony as true unless the IJ makes an express finding that the testimony is not credible. *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir. 2000). Because the IJ made no such finding here, we must assume that Rawshan's account of the February 14, 2006, meeting is accurate.

**[4]** For completeness' sake, we further observe that nothing in this record suggests that Rawshan's account of his meeting with Speyer was inaccurate. The IJ cited three pieces of evidence that could have been thought to undercut Rawshan's testimony, but, on close examination, none of them can fairly be read to do so.

**[5]** For one, the IJ noted that Rawshan's father, Khodarahm Roshan Nehad ("Khodarahm") submitted an affidavit that made no mention of the February 14, 2006, meeting in which Speyer allegedly announced his plans to withdraw as counsel. This, according to the IJ, was a problem because Rawshan testified that Khodarahm was present at that meeting, and thus could have testified to its proceedings. Before us, the government relies on this so-called inconsistency between Raw-

shan's affidavit and Khodarahm's affidavit to argue that Rawshan's account was properly discounted. But Khodarahm's affidavit was submitted and cited by Rawshan in his reply to the government's opposition to his motion to reopen solely to address the government's argument that Rawshan did not have a well-founded fear of persecution at the hands of the Taliban. In his affidavit, Khodarahm attested that he served the United States government as a translator at Guantanamo Bay, and that his service would lead the Taliban to view his son Rawshan as a political enemy. Khodarahm's affidavit was not written to address any facts related to Speyer's performance; rather, it was written to offer testimony on a subject about which only Khodarahm could reliably testify: his employment and its relationship to his son's fear of persecution. No rule of law required Rawshan's attorney to craft the affidavit to discuss the ineffective-assistance issue in addition to the well-founded-fear issue, so it is inappropriate to label this omission an "inconsistency," or to draw an inference against Rawshan's testimony on this basis.

[6] Second, the IJ observed that Speyer did not make a formal motion to withdraw, seeming to imply that this fact somehow undercut Rawshan's testimony. To the contrary, the lack of any formal motion to withdraw is entirely consistent with Rawshan's story. According to Rawshan, Speyer announced his intention to withdraw *if Rawshan proceeded with his asylum claim*. Because Rawshan agreed to voluntary departure, Speyer did not move to withdraw.

[7] Third, the IJ seemed to rely on Speyer's response to Rawshan's bar complaint. In that letter, however, Speyer did not deny Rawshan's allegations. Instead, he stated that "[i]n view of [new counsel's] acceptance of the case, and [Rawshan's] position expressed in his declaration, I do not believe Rule 3-700 of the California Rules of Professional Conduct [governing withdrawal] applies here." What point Speyer was trying to make is obscure, but there is little question that his statement did not expressly deny or rebut the basic allegation

that he intended to withdraw from the case if it progressed beyond the February 14, 2006, hearing. Since Speyer's response did not address whether he planned to withdraw as counsel, it cannot constitute substantial evidence in rebuttal of that proposition.

[8] Before us, the government relies on its trial counsel's affidavit to the effect that Speyer did a worthy job on behalf of his client. Given the self-serving nature of this declaration, it seems, at best, deserving of minimal weight (and, indeed, the IJ did not address it). Perhaps more importantly, while the government affiant stated that Speyer was zealous and that he (unsuccessfully) sought the exercise of prosecutorial discretion in his client's behalf with vigor at an early stage of the removal proceedings, the affiant said nothing about the events at the center of this dispute: whether Speyer threatened to withdraw as counsel if Rawshan proceeded with his asylum application. Indeed, the affiant could not address that issue, as only Speyer, Rawshan, and Khodarahm were present when withdrawal was discussed.

As stated, it is not clear what factual findings the IJ intended to make. To whatever extent the IJ found that Speyer did not announce any intention to withdraw from the case, that finding is not based on substantial evidence. Nothing in the record contradicts Rawshan's affidavit, the only first-hand account of what transpired between attorney and client. We proceed under the assumption that Rawshan's account of his meeting with Speyer is accurate.

[9] Taking Rawshan's testimony as true, on February 14, 2006, Speyer presented Rawshan with (1) his inability to continue with the representation beyond that day's hearing, without any explanation of how Rawshan might obtain new counsel (or even that he could likely obtain a continuance to do so); (2) a (new) negative assessment of the merits of Rawshan's claim;[4] and (3) an offer of voluntary departure, without

---

[4]According to Ms. Roshan's affidavit and bar complaint, prior to February 14, 2006, Speyer advised Rawshan and his family that his asylum

any exploration of other options (*e.g.*, asking for a continuance to obtain new counsel, requesting voluntary departure at the conclusion of removal proceedings), all within hours of a scheduled hearing. These circumstances are self-evidently coercive. It is unsurprising that Rawshan concluded that he had no real option but to accept voluntary departure; as far as he knew, the only other option was to proceed *pro se*, which, understandably, seemed untenable. Crediting Rawshan's account, Speyer's presentation misrepresented the situation by failing to explain to Rawshan (1) that Speyer could only be released from his obligation to represent Rawshan by the immigration court, and (2) that Speyer had a duty to withdraw, if the IJ were to permit withdrawal, in a way that would not cause Rawshan prejudice, which would include giving Rawshan reasonable notice and time to secure new counsel. These omissions left Rawshan with a grossly inaccurate understanding of his options, and effectively coerced him into accepting voluntary departure.

[10] In rejecting the conclusion that Speyer's conduct constituted ineffective assistance, the BIA and IJ seemed to rely primarily on Speyer's response to Rawshan's bar complaint citing a conflict between Rawshan and his sister over litigation strategy. It is unclear from the two opinions what precise question of fact Speyer's letter was thought to resolve, but it appears that the IJ and BIA concluded that Speyer suggested voluntary departure in good faith to resolve some conflict between Rawshan and his sister. We cannot approve drawing any such conclusion from Speyer's letter. The letter is delphic at best.[5] It does not offer an account of the February 14, 2006,

_____

application was likely to succeed. It appears that Speyer first presented a negative assessment of the merits of Rawshan's asylum application at the February 14, 2006, meeting.

[5]It states, without additional detail, that Speyer "perceived a conflict between Ms. Roshan's plan for resolving this case and her brother [Rawshan's], own wishes."

meeting, nor does it explain the reasoning that undergirded advising Rawshan to accept voluntary departure. While the letter asserts disagreement with Rawshan's bar complaint, it lacks additional substance. Though the letter states that Speyer perceived a conflict between Rawshan and his sister, it explains neither the content of that conflict nor how the conflict played into Speyer's decision to advise voluntary departure. In addition, the letter asserts that Speyer thought that voluntary departure would accord with everyone's wishes, but it is devoid of any reasoning or explanation that might support that assertion (not to mention the fact that Speyer's duty was to Rawshan, not to anyone else). In short, because the letter lacks any explanatory details, it cannot serve as substantial evidence for any factual determination that Speyer's recommendation was made to reconcile a familial conflict. Moreover, even were we to assume that the recommendation was so intended, the letter does not address the weighty concern that Rawshan was forced to make a snap decision in the face of his counsel threatening to withdraw.

[11] Counsel's incompetence only constitutes a violation of due process if it renders the proceeding "so fundamentally unfair that the alien is prevented from reasonably presenting her case." *Iturribarria v. INS*, 321 F.3d 889, 899 (9th Cir. 2003). Our court has not had any previous occasion to address an immigration ineffective-assistance claim based on counsel's threat to withdraw. Therefore, to determine whether Speyer's conduct was sufficiently egregious to constitute ineffective assistance, we look to two sources for persuasive guidance: (1) counsel's ethical obligations, *cf. McClure v. Thompson*, 323 F.3d 1233, 1241-42 (9th Cir. 2003) (noting that, when evaluating a Sixth Amendment claim for ineffective assistance, courts should take into account prevailing norms of professional responsibility), and (2) our jurisprudence on a counsel's threats to withdraw in similar areas of law.

[12] This case lies at the intersection of two ethical rules: the rule on withdrawing as counsel and the rule defining the

client's scope of authority. The California rule on withdrawal requires that a lawyer take all steps reasonably necessary to protect his client when he withdraws, specifically including "giving due notice to the client" and "allowing time for employment of other counsel." Cal. Rules of Prof'l Conduct R. 3-700(A)(2) (1988). In addition, the rule provides that a lawyer must withdraw if the lawyer's "mental or physical condition renders it unreasonably difficult to carry out the employment effectively." Cal. Rules of Prof'l Conduct R. 3-700(B)(3) (1988). Here, it appears that Speyer faced a personal situation that made it difficult for him vigorously to pursue Rawshan's objective of avoiding removal. Thus, under California rules of professional conduct, his obligations were to give Rawshan timely notice that Speyer needed to withdraw, and to protect Rawshan by ensuring that he had the time and opportunity to secure new counsel. Under this rule, Speyer should have, at the least, informed the immigration court of his need to withdraw and asked, on Rawshan's behalf, for a continuance to allow Rawshan time to employ new counsel. That Speyer's omissions violated this rule is clear.

The second relevant rule deals with the allocation of authority between lawyer and client. It is well settled that only the client has the authority to define the objectives of the representation. *See Davis v. State Bar*, 655 P.2d 1276, 1279 (Cal. 1983); *see also* Model Rules of Prof'l Conduct R. 1.2(a) (2002). Only the client, therefore, may decide whether to make or accept an offer of settlement.[6] *Estate of Falco*, 233 Cal. Rptr. 807, 815 (Cal. Ct. App. 1987) ("A client's right to reject settlement is absolute."). While the lawyer is expected to advise the client on the issue of settlement—and is obliged to keep the client informed enough to make intelligent decisions in that regard, *see* Cal. Rules of Prof'l Conduct R. 3-500

---

[6]We begin by examining the allocation of authority in civil cases since removal proceedings are, according to the Supreme Court, civil in nature. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

(1997) & 3-510 (1988)—it is generally held that the lawyer may not burden the client's ability to make settlement decisions by structuring the representation agreement so as to allow the lawyer to withdraw, or to ratchet up the cost of representation, if the client refuses an offer of settlement, *see, e.g.*, *Compton v. Kittleson*, 171 P.3d 172, 173 (Alaska 2007); *Jones v. Feiger, Collison & Killmer*, 903 P.2d 27, 34 (Colo. Ct. App. 1994) (holding that retainer provision under which, *inter alia*, lawyer could withdraw if client rejected settlement offer the lawyer deemed reasonable was impermissible), *rev'd on other grounds*, 926 P.2d 1244 (Colo. 1996); Conn. Bar Ass'n Comm. on Prof'l Ethics, Informal Op. 99-18 (1999) (concluding that a fee agreement may not provide that the amount due converts from a contingent fee to an hourly fee if the client rejects a settlement offer the lawyer deems reasonable); Conn. Bar Ass'n Comm. on Prof'l Ethics, Informal Op. 95-24 (1995) (concluding that retainer provision that lawyer may withdraw if client refuses a settlement offer the lawyer deems reasonable impermissibly impinges on client's right to decide whether to settle); State Bar of Mich. Standing Comm. on Prof'l and Judicial Ethics, Op. RI-132 (1992) (stating that a clause providing that lawyers for a class would only be paid by a third party if the lawyers shepherded the class to settlement was unethical).

**[13]** Similarly, it is generally held that a lawyer may not withdraw merely because a client refuses to settle. *See, e.g.*, *Augustson v. Linea Aerea Nacional-Chile S.A.*, 76 F.3d 658, 663 (5th Cir. 1996) ("[T]he cases are in almost universal agreement, that failure of the client to accept a settlement offer does not constitute just cause for a withdrawing attorney to collect fees." (string citation omitted)); *Ambrose v. Detroit Edison Co.*, 237 N.W.2d 520, 523-24 (Mich. Ct. App. 1975) ("The refusal to settle by a client can never be sufficient grounds to constitute 'good cause' for an attorney to withdraw . . . ."). It follows from these principles that a lawyer may not burden a client's decisionmaking by threatening to withdraw if the client refuses to settle. Thus, under these principles, it

was improper for Speyer to present Rawshan with an offer of voluntary departure and, in effect, to threaten to withdraw as counsel if Rawshan rejected it.

**[14]** Similarly, in the criminal context, it is widely held that counsel's threatening to withdraw unless the defendant agrees to plead guilty can render the plea involuntary. *See Iaea v. Sunn*, 800 F.2d 861, 866-68 (9th Cir. 1986); *see also Heiser v. Ryan*, 951 F.2d 559, 562 (3d Cir. 1991); *United States v. Estrada*, 849 F.2d 1304, 1306 (10th Cir. 1988); *cf. Uresti v. Lynaugh*, 821 F.2d 1099, 1102 (5th Cir. 1987) (holding that attorney's threat to request to withdraw and find replacement counsel if defendant did not plead guilty was unproblematic). Along these same lines, one court of appeals has held that counsel provides ineffective assistance when he threatens to withdraw if his client insists on exercising his right to testify. *Nichols v. Butler*, 953 F.2d 1550, 1552 (11th Cir. 1992). Although the Fifth Amendment right that applies in immigration proceedings is not necessarily coterminous with the Sixth Amendment right to counsel, this jurisprudence confirms that it is improper for a lawyer to threaten to withdraw if his client does not follow his advice on a matter of fundamental importance to the representation, and that doing so is both a violation of counsel's duties to his client and egregious conduct that threatens the fairness of the proceeding.

**[15]** Crediting Rawshan's account, it is clear that Speyer, by announcing that he would withdraw if Rawshan did not accept an offer of voluntary departure, impinged on Rawshan's authority to decide whether, and on what terms, to concede his case. Moreover, Speyer violated his duty to insure that withdrawal would be conducted in a manner that would not prejudice his client. These failings unreasonably burdened Rawshan's authority to make a settlement decision and effectively deprived Rawshan of the ability to present his case to the immigration court and to the BIA.

### B. Whether Speyer's misconduct prejudiced Rawshan

**[16]** "Prejudice is found when the performance of counsel was so inadequate that it may have affected the outcome of the proceedings." *Ortiz*, 179 F.3d at 1153. To determine whether the petitioner was prejudiced, the court "must consider the underlying merits of the case to come to a tentative conclusion as to whether [petitioner's] claim, if properly presented, would be viable." *Jie Lin*, 377 F.3d at 1027. The question before us is not whether Rawshan's claims would prevail, but merely whether they are plausible enough to warrant consideration by the BIA on remand. *Mohammed*, 400 F.3d at 794.

Rawshan argues that Speyer's voluntary-departure recommendation prejudiced him because he had a nontrivial chance of success both in applying for asylum and related relief and in appealing the IJ's determination that he was removable.

Rawshan claims persecution on account of his ethnicity (Hazara), political affiliation (anti-Taliban), and religion (Shia Muslim). On all fronts, he claims that he would be persecuted by the Taliban. Because the Taliban is not in power, he would have to show that they are a group that the Afghan government is unwilling or unable to control, *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007), and he would have to show that he has a well-founded fear of persecution at their hands, *see* 8 U.S.C. § 1101(a)(42)(A). Establishing a well-founded fear of persecution requires proof that persecution is a " 'reasonable possibility.' " *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987)). "[E]ven a ten percent chance of persecution may establish a well-founded fear." *Id.*

In support of his claim, Rawshan has submitted (1) his completed asylum application and an affidavit explaining that he fears persecution because of his religion, ethnicity, and father's affiliation with the United States government; (2) var-

ious news articles, government reports, and NGO reports documenting the growing power of the Taliban insurgency; (3) news articles and NGO reports documenting the Taliban's persecution of Hazaras, Shias, and political opponents; and (4) an affidavit from his father, Khodarahm, attesting that his father's service as a translator for the United States government at Guantanamo Bay would lead the Taliban to perceive Rawshan as a political opponent, and thus to target him for persecution. Khodarahm's affidavit further claims that the Taliban has killed the family members of some of Khodarahm's fellow translators because of their affiliation with the United States government. These materials are plainly sufficient to show that Rawshan had a plausible chance of proving a well-founded fear of persecution by persons the Afghan government is unwilling or unable to control.

**[17]** Rawshan also claims that he had a colorable appeal from the IJ's tentative order of removal. The IJ's determination that Rawshan was removable was based on Rawshan's conviction for violating a protective order. It is undisputed that this conviction was vacated *nunc pro tunc* when the trial court, on the parties' joint motion, granted Rawshan leave to withdraw his guilty plea, and the prosecutor dismissed the charge. The government, however, argued that the conviction was still valid for immigration purposes because it was vacated for rehabilitative or immigration-related reasons, not for any substantive or procedural defect in the conviction itself. We have generally followed that line of reasoning, but we have required that the government prove by clear and convincing evidence that the court's *only* reasons for vacating the conviction were unrelated to any substantive or procedural defect. *Nath v. Gonzales*, 467 F.3d 1185, 1188-1189 (9th Cir. 2006); *see also* 8 U.S.C. § 1229a(c)(3)(A) (providing that the government must prove by clear and convincing evidence that an alien previously admitted to the United States is removable). Here, it is true that Rawshan's moving papers focused on the immigration consequences of the conviction, but the moving papers also touched on the fact that Rawshan was not

informed of the immigration consequences of his plea, and asserted that Rawshan's mental illness caused him to violate the protective order, which could be read to imply an insanity defense to the charge. Without any explanation from the state court (and there is none, as the court order is devoid of any reasoning), it is difficult to know which of the reasons reflected in the parties' submission convinced the court to allow Rawshan to withdraw his plea. Thus, Rawshan presents colorable grounds for appeal.

In light of the above analysis, Rawshan has presented evidence that Speyer's midconduct may have affected the outcome of his case; accordingly, we conclude that Rawshan has demonstrated prejudice.

## IV. Conclusion

Speyer's deficient performance and the prejudice resulting from it add up to a violation of Rawshan's Fifth Amendment right to due process. Faced with a due-process violation that rendered the removal proceedings fundamentally unfair, the BIA abused its discretion in denying Rawshan's motion to reopen. *Ray*, 439 F.3d at 590.

[18] Because we will grant the petition on Rawshan's ineffective-assistance claim, we need not address his claims for reconsideration of removal or reopening on the basis of changed country conditions. Rawshan will be able to raise both of those issues on remand.

PETITION GRANTED and REMANDED.